**MAR–LEN OF LOUISIANA, INC., Appellant,**

v.

**The GORMAN–RUPP COMPANY, Appellee.**

**No. 09–89–063 CV.**

Court of Appeals of Texas, Beaumont.

Aug. 30, 1990.

Rehearing Denied Sept. 18, 1990.

Tommy Yeates, Moore, Landrey, Garth & Jones, Beaumont, for appellant.

Thomas B. Greene, III, Crain, Caton & James, Houston, for appellee.

## OPINION

WALKER, Chief Justice.

This is a suit by appellee, The Gorman–Rupp Company (hereinafter referred to as "Gorman–Rupp" or appellee) against appellant, Mar–Len of Louisiana, Inc. (hereinafter referred to as "Mar–Len" or appellant) for breach of contract. The breach of contract claim is in connection with a purchase order submitted by Mar–Len to Gorman–Rupp. The purchase order is in re-

gard to the manufacture and supply of certain goods, including pumps and control devices, which were to be utilized in the construction of five (5) transfer stations for a waste treatment facility for the City of DeRidder, Louisiana. Mar–Len was the general contractor on a portion of the waste treatment project.

As reflected by plaintiff's first amended original petition, Gorman–Rupp also sued Safeco Insurance Company of America (hereinafter referred to as "Safeco") in connection with the payment and/or performance bonds which were required to be procured by Mar–Len in connection with the project. Mar–Len and Safeco responded to Gorman–Rupp's allegations by asserting a general denial together with certain affirmative defenses. In particular, Mar–Len and Safeco affirmatively asserted that all conditions precedent to plaintiff's recovery had not occurred or had not been satisfied.

On October 10, 1988, this action proceeded to trial before a jury in the 136th Judicial District Court, Honorable Jack King presiding. At the close of plaintiff's evidence, Mar–Len and Safeco asserted their motions for directed verdict. The trial court took such motions for directed verdict under consideration for a later ruling. Upon the close of all the evidence, Mar–Len and Safeco re-urged their motions for directed verdict. The trial court again took same under consideration. On October 13, 1988, the jury returned a ten (10)-two (2) verdict in favor of appellee.

Thereafter, Mar–Len and Safeco filed with the trial court their motion for judgment non obstante veredicto, and motion for judgment. The judgment was signed by the trial court on November 29, 1988. As reflected by said judgment, the trial court permitted Gorman–Rupp to recover the sum of $62,500.00 plus pre-judgment interest in the amount of $18,270.55 against Mar–Len. The trial court further found that Gorman–Rupp should take nothing against Safeco. Thereafter, on December 20, 1988, Mar–Len timely filed with the trial court its motion for new trial. After a hearing was held upon said motion, the trial court denied same.

The appellant has duly perfected this appeal to this Court, and, for reasons set out in appellant's brief, appellant seeks a reversal of the judgment of the trial court or in the alternative, a remand for a new trial.

A detailed statement of the facts will add clarity to our opinion in this case. Mar–Len is a general construction contractor. In March of 1983, Mar–Len entered into a contract with the City of DeRidder, Louisiana under the terms of which Mar–Len was to construct a municipal waste water treatment system. The project was EPA regulated. The project consisted of five (5) separate lift stations, which were designed to transfer waste products.

In conjunction with the execution of the original construction contract, Mar–Len contracted with Safeco to provide a payment bond and a performance bond. The City of DeRidder, Louisiana retained the engineering firm of Meyer & Associates, Inc., to monitor the construction of the project.

Gorman–Rupp is a Mansfield, Ohio, corporation which engages in the manufacture and sale of commercial pumps and related equipment, for the utilization of same in municipal sanitary systems. When an authorized representative of Gorman–Rupp discovers the existence of a potential municipal project, the representative obtains all of the necessary plans and specifications for that project and forwards same to Gorman–Rupp. Gorman–Rupp would review the plans and specifications, and thereafter make a determination as to the appropriateness of its equipment. More specifically, the plans would first be reviewed by Gorman–Rupp's sales department. The sales department of Gorman–Rupp would then transfer the plans and specifications to its mechanical and electrical engineering section.

The engineering section of Gorman–Rupp would design the proper piping, valves and other mechanical design features of the system. Thereafter, the electrical engineering section would review the electrical requirements of the project. Gorman–Rupp would then prepare a list of materials, determine all applicable costs,

and prepare a bid price for the project. If Gorman–Rupp was unsuccessful in obtaining the contract, all costs associated with the submission with the bid would not be compensable.

In regard to the pump package made the basis of this action, Gorman–Rupp followed the above submission process. In connection with the DeRidder project, Pump & Power of Houston, Texas, was Gorman–Rupp's authorized representative. In regard to the DeRidder project, Gorman–Rupp through Pump & Power of Houston quoted an original bid price of $349,590.00.

Mar–Len, however, had received a lower bid from a company known as Crown Pump. Accordingly, Mar–Len originally entered into a purchase order with Crown Pump, for an amount approximately $160,-000.00 less than the Gorman–Rupp bid. The purchase between Mar–Len and Crown Pump was conditional in the sense that certain "submittals" of the system had to be approved by Meyer & Associates, Inc., the project engineer.

Prior to the actual inclusion of the pump package into the project, the project engineer must approve the various performance specifications (known as "submittals") of the pumps. This is accomplished by the pump manufacturer and general contractor submitting to the project engineer submittals of the mechanical, electrical and other related specifications of the pumps. There would be no liability on the part of Mar–Len in regard to the proposed orders, if the city's engineer refused to accept the submittals of the pump. This express condition was written on the Crown Pump purchase order.

In May of 1983, Meyer & Associates, Inc. began receiving submittals in regard to Crown Pump. Meyer & Associates, Inc. did not, however, approve the various submittals of Crown Pump. In August of 1983, the project engineer issued a final rejection of the Crown Pump submittals, formally disapproving of same. As a result of the project engineer disapproving the use of Crown Pumps, Mar–Len was placed in a position of having to seek a new supplier.

Thereafter Mar–Len contacted Gorman–Rupp for the purpose of receiving a revised bid for the pump package. By letter dated July 22, 1983, Gorman–Rupp, through Pump & Power of Houston informed Mar–Len that Gorman–Rupp had reduced its price to $315,871.00. The new bid of Gorman–Rupp was reduced from its former bid in that Gorman–Rupp had devised a new, special control system.

Based upon Gorman–Rupp's revised bid, Mar–Len issued its company's purchase order to Pump & Power of Houston for the purchase of the pump package. Upon the face of the purchase order are the words, "pending submittal approval".

Robert Ehalt, the representative of Gorman–Rupp who was in charge of the project, testified in person at the time of trial. According to Ehalt's testimony, Mar–Len's purchase order constituted the entire "contract" in connection with this matter. Ehalt testified that no other document or documents, other than the purchase order, constituted the contract.

Ehalt further testified that there was nothing unusual in the pump supply industry for a purchase order to include the limited condition of "pending submittal approval". In addition, Jeffrey Kopp, an employee of Pump & Power Equipment of Houston testified that "pending submittal approval" is a standard statement on purchase orders in this particular industry.

A few days after Mar–Len provided to Gorman–Rupp its purchase order, Mar–Len filed an arbitration with the City of DeRidder. Mar–Len had based its contract bid price with the City of DeRidder upon the belief that Crown Pump would be used on the project. The arbitration involved the additional amount of money that Mar–Len would have to pay to Gorman–Rupp, for the use of Gorman–Rupp's pumps rather than Crown pumps. After the arbitration was filed by Mar–Len, the project engineer recommended to the City of DeRidder that Mar–Len no longer receive progress payments for the work performed by Mar–Len.

In the meantime, Gorman–Rupp accepted the purchase order and began to work on

the project. The purchase order was submitted with the qualifications "pending submittal approval". In this context, submittal approval meant approval by the City's engineer of the plans and specifications of the pump assemblies to be supplied. In this case, there were five (5) pump stations, three (3) of which involved standard Gorman–Rupp pump assemblies, and two (2) of which had to be custom engineered and designed. By the time the contract had been awarded to Gorman–Rupp, Mar–Len was months into the contract and there was a sense of urgency to get the pumps approved and manufactured.

There was a separate submittal for each pump station under the contract. The first station that needed pumps was the "Highway 27 Pump Station". The efforts of Gorman–Rupp were thus directed to preparation of submittals for that station first. Normally, according to the evidence, Gorman–Rupp would have tendered the entire submittal package at one time. Because of the urgent situation that Mar–Len found itself in, however, Gorman–Rupp deviated from the normal process to accommodate Mar–Len and transmitted portions of the submittals when they were ready. Gorman–Rupp first submitted shop drawings showing how the pumps, motors and other parts of the assemblies would lay out in the building. Mar–Len was at a point in the construction of the building that it needed to know the layout. The shop drawings were submitted within a few days of receipt of the purchase order. The layout was approved by the engineer.

The rest of the submissions included the mechanical portion, electrical portion and certified performance test curves on the pump themselves. The mechanical portion of the Highway 27 Station was submitted in early October, 1983. Following the mechanical submissions, Gorman–Rupp personnel were working to prepare the electrical submission. The electrical submission related to the various control systems to operate the pumps. The original specifications had called for an ultrasonic pump and Gorman–Rupp had suggested its own type of control system, known as EPS or electronic pressure switch. By using Gorman–Rupp's own proprietary system instead of the ultrasonic level system contained in the original submission, Gorman–Rupp was able to lower its bid from almost $350,-000.00 to approximately $315,000.00. The electrical submissions on the Highway 27 Station were transmitted in November, 1983. The engineers had a number of questions concerning the electrical submission, primarily because it differed from the original plans. The certified performance curves on the pumps were submitted in December, 1983.

During this same time period, Gorman–Rupp was preparing submittals on the other custom designed plant station, the "Old Plant Station", as well as the three (3) smaller and relatively standard pump stations. These submittals were made in late 1983 also.

Formal approval by the engineers consist of an approval stamp on the submittal package itself. The mechanical submittal for the Highway 27 Pump Station was approved as of October 17, 1983 which was a prompt approval according to the engineer. The mechanical submission on the Old Plant Station was formally approved on January 4, 1984, subject to the certified test curve. Subsequently the test curves were received by the engineers and approved in early 1984. The electrical submittals were also approved internally by the engineers, but the formal approval, consisting of the stamp on the documents, was never completed due to Mar–Len shutting down the program. According to Richard Meyer, the engineer in charge, had Mar–Len not stopped work on the project, the formal approval would have come in due course.

The engineers had concentrated first on the two (2) major pump stations that were custom built. Submittals were received on the three (3) smaller pump stations and the engineers had requested revision and resubmittal of the submissions. According to Richard Meyer, the changes were minor or incidental and well within the capacity of Gorman–Rupp to correct. But for Mar–Len's walking off the job, these submittals would have been approved.

When Mar–Len placed its purchase order with Gorman–Rupp, it also instigated arbitration against the City of DeRidder. Because of allegations made in the arbitrations, the City stopped progress payments in late 1983. In mid February, 1984, Mar–Len stopped working on the project. Mar–Len notified the City it was shutting down the project and the engineer stopped processing the submittals when the project was shut down.

Mar–Len also notified its vendors, including Gorman–Rupp that it had stopped work on the project for non-payment and that the vendors were proceeding with the work at their own risk. When Gorman–Rupp was notified of the dispute between Mar–Len and the City and the fact that Mar–Len had walked off the job, Gorman–Rupp stopped working on the project for the time being. Mar–Len did not expect the vendors to continue to work after they were notified of the problems in early 1984. It was Gorman–Rupp's intention to wait until Mar–Len had resolved its problem with the City and then proceed to completion with the contract.

Mar–Len ultimately reached an agreement with the City of DeRidder in approximately October, 1985. Mar–Len never told Gorman–Rupp that it had resolved its dispute with the City of DeRidder, however, Alan Boudreaux, the purported attorney for Mar–Len, did tell Robert Ehalt of Gorman–Rupp in a telephone conversation that the problems with the City were resolving. Gorman–Rupp was standing by and prepared to proceed to complete the contract. In December, 1984, Gorman–Rupp advised Mar–Len that it was ready to conclude the contract. Mar–Len ultimately contracted with ITT Marlowe to supply the pumps and another contractor to supply the control systems.

Mar–Len had commenced the arbitration to determine who should pay the additional $165,000.00 for the use of the Gorman–Rupp pumps. Mar–Len received an additional $160,000.00 as a result of the arbitration, however, Mar–Len did not use Gorman–Rupp pumps. Mar–Len paid approximately the same for the Marlowe pumps

that it would have paid for the Crown pumps had the Crown pumps been approved.

Richard Meyer testified at trial that during the settlement process between the City and Mar–Len, he suggested that either Gorman–Rupp or ITT Marlowe were capable of supplying products that would comply with the specifications.

To summarize, Mar–Len submitted the purchase order to Gorman–Rupp in September, 1983. The purchase order was accepted by Gorman–Rupp, which began immediately to produce the submittals necessary for ultimate engineering approval. The mechanical submission on the two (2) main pump stations were approved, the certified test curves for the pumps to be used in those stations were approved and formally acknowledged by the engineer. The electrical submissions relating to the control panels were also approved internally by the engineer and would have been formally approved had the project not stopped. In addition, the three (3) smaller pump stations were in the process of being approved, and the engineer in charge stated that he felt that the submission on the three (3) small pump stations would also have been approved.

In response to special questions, the jury found that a contract had been created; that all conditions precedent had been met; and that Mar–Len had breached the contract.

Appellant raises two points of error asserting that there was no evidence and/or insufficient evidence to support the jury's response to special questions numbers one and two and alternatively that should the court find a contract existed by and between appellant and appellee, then there is no evidence and/or insufficient evidence to support the jury's response to special question number three. This Court understands appellant's primary thrust to be that the condition precedent to the formation of a contract, and any subsequent liability of appellant to perform under such a contract, was not satisfied. With this position we disagree.

When reviewing the evidence for legal insufficiency ("no evidence"), an appellate court is limited to reviewing only the evidence tending to support the jury's finding and may not consider contradictory evidence. When there is more than a scintilla of evidence, the appellate court may not overturn the jury's finding. *Sherman v. First National Bank in Center, Texas*, 760 S.W.2d 240, 242 (Tex.1988). When reviewing a jury verdict to determine factual insufficiency of the evidence ("insufficient evidence"), this Court must consider and weigh all of the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

Under either test set forth above, a review of the evidence in this case shows that there is clearly sufficient evidence for the jury to make the finding that it did in response to the special questions. The thrust of appellant's argument is that the evidence is insufficient to establish a contract or, in the alternative, a breach of contract, because of a failed condition precedent. The alleged condition precedent in this case is approval of the Gorman–Rupp submittals by the engineer for the City of DeRidder.

Appellant correctly points out that a condition precedent in the law of contracts may be either a condition which must be performed before the agreement of the parties shall become a binding contract, or may be a condition which must be fulfilled before the duty to perform the existing contract arises. *Modine Manufacturing Co. v. North East Independent School District*, 503 S.W.2d 833, 843 (Tex.Civ.App. —Beaumont 1973, writ ref'd n.r.e.). In other words, a condition precedent may either relate to the formation of a contract or liability under the contract. *Dillon v. Lintz*, 582 S.W.2d 394, 395 (Tex.1979).

In this case the jury was instructed concerning the definition of contract and conditions precedent and was called upon to decide if the contract was consummated (question number one) and if so, if Gorman–Rupp satisfied all conditions precedent owed to defendant. (question number two). The jury answered both questions in the affirmative.

As to the creation of the contract, the jury had sufficient evidence upon which to base its decision. A purchase order was submitted to Gorman–Rupp. Ann Blackwell, the general manager of defendant, appellant herein, had the purchase order issued in September, 1983 under her direction and with her authorization. Gorman–Rupp accepted the purchase order and went to work. Gorman–Rupp considered the purchase order, as accepted, as a contract. Gorman–Rupp had no form for formal acceptance of the contract.

Ann Blackwell testified that she expected Gorman–Rupp to manufacture the pumps as soon as their submittals were approved. In addition, she expected Gorman–Rupp to do whatever necessary for approval of the submittals. Mar–Len expected performance from Gorman–Rupp. As early as January, 1984, David Boudreaux, project coordinator for Mar–Len, was expecting some of the pump assemblies to be delivered as at least partial submittals had been approved. In fact, he had been requesting partial delivery as of January 10, 1984. The jury could certainly conclude from Mar–Len's conduct and Robert Ehalt's testimony that a contract had been formed.

Mar–Len takes the hypertechnical position that only the mechanical submissions had been approved, and thus all conditions precedent had not been satisfied. The testimony by the person in charge of approval, Richard Meyer, clearly indicates however that the submittals would have been completely approved. As of early 1984 there was absolute complete approval on the mechanical portion of the two (2) large stations, Highway 27 and the old plant. In addition, the engineers had approved the concept of control system early, and had made a detailed review of the electrical submittals. Gorman–Rupp had responded to that review and the engineers were in agreement to issue the formal approval of the control package on the two (2) large stations. All that was left to be done on the two (2) large stations was simply

putting a stamp on the documents and transmitting them with the approval.

The evidence is basically undisputed that a significant portion of the submittals had been approved and that the remainder would have been approved had not Mar–Len shut down the project. Mar–Len, again, takes the technical position that all of the approvals had to have been made before it had any obligation under the contract. Mar–Len also states that an express condition must be exactly fulfilled or no liability can arise.

▮▮▮ The law is not so demanding and hypertechnical as appellant would have this Court believe. For example, a condition precedent may be waived and waiver may be inferred from a party's conduct. *Sun Exploration and Production Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987). The performance of a condition precedent can be waived or modified by the party to whom the obligation was due by either word or deed. *Ames v. Great Southern Bank*, 672 S.W.2d 447, 449 (Tex.1984). A condition precedent may be excused under certain circumstances. *See, Lesikar Construction Co. v. Acoustex, Inc.*, 509 S.W.2d 877, 881 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.). Indeed it is a rule of construction that a forfeiture by finding a condition precedent is to be avoided when possible under another reasonable reading of the contract. *Schwarz–Jordan, Inc. of Houston v. Delisle Construction Co.*, 569 S.W.2d 878, 881 (Tex.1978). Courts prefer to construe a contract provision as a covenant rather than a condition. *Group Hospital Services, Inc. v. One and Two Brookriver Center*, 704 S.W.2d 886, 891 (Tex. App.—Dallas 1986, no writ).

Simply put, the appellant breached the contract by repudiation. Having done so at a time when all conditions precedent had not been technically completed, it can not now complain that all conditions precedent had not been fulfilled.

The wording of jury question number two is of important significance: "Do you find that Gorman–Rupp Company has satisfied all conditions *owed* to Mar–Len of Lou-isiana, Inc.?" To which the jury answered, "Yes". (emphasis added).

We do not perceive the word "owed" to be some insignificant or inadvertent verb. We perceive the word "owed" to ask the jury whether appellee had performed all conditions precedent to appellee's obligation under the contract *which were possible prior to appellant's breach by repudiation.* (emphasis added).

▮▮▮ The doctrine of repudiation or anticipatory breach of contract is well established in Texas. *Group Life & Health Insurance Co. v. Turner*, 620 S.W.2d 670, 672 (Tex.Civ.App.—Dallas 1981, no writ). When one party repudiates the agreement and refuses to be bound by material obligations, the other party may accept such repudiation as final and is not required to further regard the obligations imposed on him. *Dunham and Ross Co. v. Stevens*, 538 S.W.2d 212, 216 (Tex.Civ.App.—Waco 1976, no writ). Anticipatory repudiation of a contract may consist of either words or actions that indicate that a party is not going to perform the contract according to its terms in the future. *Builder's Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex. App.—Houston [14th Dist.] 1984, no writ). Repudiation of a contract is a breach of contract. *Abrams v. Brent*, 362 S.W.2d 155, 159 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.).

Having been charged with the law relating to anticipatory repudiation, the jury found in response to question number three that Mar–Len had breached the contract. The evidence is clearly undisputed that Mar–Len repudiated its contract with Gorman–Rupp. In February, 1984, representatives of Mar–Len told Gorman–Rupp that it had stopped work on the project and that vendors would proceed at their own risk. Mar–Len expected the vendors to stop work. During the time in which Mar–Len was not working but in dispute with the City of DeRidder, Gorman stood by ready, willing and able to perform under its agreement if things got back on track. When Gorman heard that Mar–Len's dispute with the City was about to be resolved, it asked for Mar–Len's confirmation to continue

with the contract, which was never received. Indeed, Mar–Len went to another vendor, ITT Marlowe, when it had resolved its dispute with the City.

In addition, in November, 1985, Gorman–Rupp sent a letter to Mar–Len stating that it had considered Mar–Len to have repudiated the contract. Gorman–Rupp asked Mar–Len that if Mar–Len did not repudiate the agreement, would Mar–Len so advise Gorman–Rupp in writing that it intended to honor the purchase order. Mar–Len confirmed the repudiation by its silence.

There is certainly sufficient evidence upon which the jury could find that Mar–Len breached its contract with Gorman–Rupp by repudiating it. Once Mar–Len repudiated the contract, Gorman–Rupp was relieved from any obligation to proceed further. *Dunham and Ross Co., supra.* Mar–Len may no longer assert its procedural rights under the contract. *See, Tribble & Stephens Co. v. Consolidated Services, Inc.,* 744 S.W.2d 945, 950 (Tex.App.—San Antonio 1987, writ denied). Thus, appellant cannot now complain about the failure of Gorman–Rupp to completely satisfy the conditions precedent under the contract.

Based upon the foregoing reasons and analyses, the judgment of the trial court is in all things affirmed.

AFFIRMED.