

## NUMBER 13-12-00293-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**PERRY D. (DON) WRIGHT
AND LEE A. MURPHY,**                                                **Appellants,**

**v.**

**THE MODERN GROUP, LTD.,
THE MODERN GROUP GP, INC.,
MODERN EPC, INC., WILL CRENSHAW
AND CASEY CRENSHAW,**                                                **Appellees.**

---

### On appeal from the 136th District Court
### of Jefferson County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Longoria
### Memorandum Opinion by Justice Benavides

By six issues, appellants Perry D. (Don) Wright and Lee Murphy appeal the trial

court's granting of summary judgment in favor of appellees The Modern Group, Ltd. et al.[1]  We affirm.

## I.      BACKGROUND[2]

### A.      The Underlying Lawsuit

Appellants are former employees of Modern EPC, Inc. ("Modern EPC"), a wholly-owned subsidiary of The Modern Group, Ltd., and its general partner, The Modern Group GP, Inc.  Modern EPC was an engineering, procurement, and construction company in the oil and gas industry.  The Modern Group, Ltd. and The Modern Group GP, Inc. are owned by appellees Will and Casey Crenshaw.

Following their termination of employment from Modern EPC, appellants sued appellees and alleged various causes of action, including:  fraud, statutory fraud, breach of contract, promissory estoppel, negligent misrepresentation, negligence, and gross negligence.  Appellants sought damages for:  past and future "benefit of the bargain" damages; $2,000,000 related to a purported contract discussed in more detail below; past and future lost wages and/or lost earning capacity; past and future lost employment compensation package benefits; mental anguish; reliance damages; attorney's fees; and punitive/exemplary damages.

### B.      The Alleged Contracts

---

[1] The full list of appellees is as follows:  The Modern Group, Ltd., The Modern Group GP, Inc., Modern EPC, Inc., Will Crenshaw, and Casey Crenshaw.

[2] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

2

The underlying lawsuit relates to three purported contracts made between appellants and appellees.

### 1.    August 13, 2007—Five-Year Oral Employment Contract

The first deals with an oral five-year employment agreement allegedly made on August 13, 2007.   This oral employment agreement was struck between appellants and Will Crenshaw and deal exclusively with appellants' employment in the Crenshaws' new start-up company, Modern EPC.   Appellants assert that prior to their employment with Modern EPC, both were "well regarded," "well compensated," "high-ranking employees" with a similar business, Chicago Bridge & Iron (CB&I).   On August 13, 2007, Will met with appellants and solicited their employment to help start-up Modern EPC.   Wright testified that during these negotiations, Will and appellants orally agreed to a minimum five-year employment commitment with Modern EPC.   During his deposition, Wright described the agreement as "a handshake" and "a commitment."

During the negotiations on August 13, 2007, Wright testified that none of the parties discussed terms in which anyone could "leave" or be fired under the agreement. According to Wright, the parties "never discussed" how anyone could leave employment with Modern EPC because "[i]t wasn't an option for either one of us to part ways with the other."   Wright summarized the negotiations that day as follows:

> What we talked about was pretty simple. It was that long-term commitment that we both had for each other and we all had for each other. The term "termination" never entered anybody's mind.

Wright asserted that he and Murphy were not at-will employees, but a written definition of their employment status or terms of employment was not made.

3

Murphy testified to a similar account of the August 13, 2007 meeting. Murphy described the agreement as a "joint commitment." According to Murphy, Will was committed to appellants for five years, and appellants were committed to Modern EPC for five years. Murphy stated further in his deposition that he was led to believe, through representations by Will, that "[Will] would stand behind us in our efforts to get this company going for a period of five years." Murphy defined these commitments as he and Wright "were willing to leave [their] jobs at CB&I, start this adventure and that it wasn't for a short term." Murphy further stated that Will, on behalf of Modern Group, "would give [Modern EPC] a fair opportunity to be successful." Murphy acknowledged that nothing from the August 13, 2007 negotiations was reduced to writing. During his deposition, Murphy also acknowledged that he signed an employee manual on August 27, 2007, which states that he was hired on as an at-will employee. Murphy later stated, however, that he did not understand his status to be that of an at-will employee because he "had a commitment from [Will]." Finally, appellants attached an exhibit to their live petition, which purports to be an agreed-upon bonus plan for calendar year 2008, which stemmed from this oral agreement.[3]

## 2. The Phantom Equity Agreement

The second alleged agreement is known as the Phantom Equity Agreement. Around late August 2007 or early September 2007, appellants approached Will to discuss what Murphy described in his deposition as a plan to own stock or become

---

[3] According to the record, appellants' individual bonuses exceeded $100,000 for that calendar year.

shareholders in Modern EPC "in order to attract and hire people that [appellants] wanted to seek out." Murphy testified that at the time he and Wright brought up this idea, Will "was a little surprised that [appellants] were bringing it up at [that] time." Murphy stated that he told Will that the reason for developing this stock/shareholder plan was to squelch fears that Modern EPC would be sold "unbeknownst to [Murphy] and without any of [Murphy's] input into that decision matter." Murphy described the stock/shareholder plan as "reinsurance." Put more colloquially, appellants stated that they wanted "more skin in the game" to realize a profit if Modern EPC was ever sold to a willing buyer.

Murphy testified that in another meeting, the Crenshaws told them that they thought appellants' stock/shareholder plan was a "good idea" and agreed to give appellants each a five percent stake in Modern EPC. On September 21, 2007, Casey emailed appellants a written draft agreement of the plan prepared by a law firm, but neither appellants nor the Crenshaws agreed to the language. Later, on December 19, 2007, Casey emailed a copy of the "Phantom Equity and Change of Control Agreement," in letter form, to appellants, which Casey described as an agreement which "handles the spirit of the deal." The agreement stated the following on Modern Group letterhead:

12/18/07

[ . . . . ]

Reference:
        Modern EPC, Inc
        Phantom Equity and Change of Control Agreement

Effective Date:      September 1, 2007

**Phantom Equity:**

Description: 5% of the outstanding shares of Modern EPC (5% ownership)
—Vesting Date: 5 years from the effective Date and must be employed by Modern EPC or The Modern Group, Ltd

—At the time of vesting you will have the right to do one of the following options:

- Convert Phantom Equity of Modern EPC to 5% of the outstanding shares of Modern EPC and be a minority shareholder with minority rights (5% ownership)

- Sell the 5% phantom equity of Modern BPC for fair market value (FMV) back to The Modern Group. Ltd (Fair market value must be agreed to by both parties: if not agreed by both parties then FMV will be based on an enterprise value using the following method: *5* times EBITDA (or actual sales price of Modern EPC) less all liabilities (then apply the percentage ownership (FMV) multiplied by 5%))

**Change of Control (during the 5 year vesting period):**

Description: Qualifying Event:  During the 5 year vesting period The Modern Group, Ltd sells a majority and controlling interest in Modern EPC, Inc. (this does not include a forced sell by our bank/financial institution)

— Qualifying event Payment:  The greater of $1,000,000 (one million dollar [sic]) or the FMV (see definition above) of the 5%

— Payment will be made 90 days after the qualifying event

As with all employees of The Modern Group, Ltd and Modern EPC, Inc you are an "AT WILL" employee.  This agreement is meant to be an incentive

to stay with Modern EPC for a minimum of 5 years and to provide a defined value if there is a Change of Control event during the first 5 year period.

We are excited about this venture and the future of Modern EPC!

This agreement is agreed to and authorized 12/19/2007 by:

[signature]
Casey Crenshaw
On behalf of:   The Modern Group, Ltd / Modern EPC, Inc.

The record shows that Wright and Murphy replied separately to Casey's email, and both appellants stated that they were in agreement with the document.

### 3.     Sale of EPC Promise

The final alleged agreement involves the purportedly failed sale of Modern EPC to a French-based company named Technip in April 2009 for $16 million.   According to appellants' brief, pursuant to Modern EPC's offer of sale to Technip, Will promised to pay them $1 million each.

Amos Claude Warner, Jr., former vice president of sales at Technip, testified in his deposition that Will pitched the idea of Technip buying Modern EPC for $15-16 million, but Technip never purchased Modern EPC.   According to Warner, Wright called him four days after the initial offer and told him that Will "pulled the plug" on the offer. Will testified that he remembered wanting to sell Modern EPC, but could not remember the exact asking price, and he also acknowledged that the sale never went through.

Wright testified that Modern EPC was shut down on May 1, 2009.   According to Wright, Modern EPC fired all of its employees, but kept a "handful of people for another week to tie up as many loose ends" as they could.   Wright stated in his deposition that Casey asked him and Murphy to stay on for two weeks after May 1, 2009.

7

**C.     Summary Judgment Proceeding**

Appellees collectively filed a traditional motion for summary judgment on each of appellants' causes of action.   Appellants filed a response, appellees filed a reply, and appellants filed a sur reply.   The trial court granted appellees' motion for summary judgment on all of appellants' claims and entered a final judgment which disposed of all claims, motions, defenses, and counterclaims presented in this case.   This appeal followed.

## II.     STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo.   *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007); *Valence Op. Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).   When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.   *Valence*, 164 S.W.3d at 661 (citing *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)).   Under Texas Rule of Civil Procedure 166a(c), a party moving for summary judgment bears the burden to show that that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law.   TEX. R. CIV. P. 166a(c); *see Knott*, 128 S.W.3d at 215–16.   We may affirm a summary judgment only when the record shows that a movant has conclusively disproved at least one element of each of the plaintiff's claims.   *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).   Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as a ground for reversal.   TEX. R. CIV. P. 166a(c).

## III. DISCUSSION

By six issues, appellants assert that the trial court erred in granting appellees' motion for summary judgment.[4]   For the sake of clarity and organization, we will address these issues out of order.

## A. Breach of Contract Claims

By their sixth issue, appellants contend that the trial court erroneously granted summary judgment on their breach of contract actions.

In Texas, the general rule has been that absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all.   *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998).   General statements do not justify the conclusion that the speaker intends by them to make a binding contract of employment.   *Id.*   Instead, for such a contract to exist, the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances. *Id.*   An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances.   *Id.*   Furthermore, oral promises modifying employment at-will are unenforceable under the Statute of Frauds if they cannot be performed in one year.   *Id.*; *see* TEX. BUS. & COM. CODE ANN. § 26.01 (West 2009).   An employment contract for an indefinite term is considered performable within one year.   *Brown*, 965 S.W.2d at 503 (citing *Bratcher v. Dozier*, 346 S.W.2d 795,

---

[4] Appellants' first issue is a catch-all issue that applies to all of the remaining issues.   In it, they generally assert that the trial court reversibly erred in granting the motion for summary judgment.   To the extent that it is considered a full issue for our review, it is overruled for reasons stated in this opinion.

9

796 (Tex. 1961)). However, it would be unusual for oral assurances of employment for an indefinite term to be sufficiently specific and definite to modify an at-will relationship. *Brown*, 965 S.W.2d at 503.

### 1. Five-Year Oral Employment Agreement

We turn first to the alleged five-year oral employment contract between appellants and appellees. Appellees assert that appellants failed to show that Modern EPC expressly and unequivocally agreed not to fire them except for clearly specified circumstances in order to overcome the at-will presumption articulated in *Brown*. *See id.* We agree.

Wright admitted in testimony that a written definition of his or Murphy's employment status or terms of employment was not made. Murphy also acknowledged that nothing from the August 13, 2007 negotiations was reduced to writing. While the record shows that Murphy testified that he did not understand his status to be that of an at-will employee because he "had a commitment from [Will]," this is not enough to overcome the at-will presumption. *See Ed Rachal Foundation v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) ("[Plaintiff's] personal understanding of his contract, or annual renewals of it in the past, do not unequivocally indicate that the Foundation intended to be bound throughout that term."). Furthermore, the record shows that both appellants signed an acknowledgement form attached to Modern EPC's human resources manual, which expressly states that the nature of each of their employment relationships with Modern EPC was that of at-will employees. Accordingly, we hold that appellants were at-will employees.

We also conclude that the Statute of Frauds rendered this purported five-year oral employment agreement unenforceable as a matter of law. The issue of whether a contract comes within the statute of frauds is a question of law. *Bratcher*, 346 S.W.2d at 796. The Statute of Frauds demands that an agreement which is not to be performed within one year from the date of making the agreement must be in a signed writing. *See* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(6). Appellants each clearly testified that the parties agreed to an employment agreement for a minimum term of five years. We take this evidence as true. *See Dorsett*, 164 S.W.3d at 661. Accordingly, this employment agreement came within the Statute of Frauds, and because the agreement was oral and not a signed writing, it was unenforceable. *See id.*; *Brown*, 965 S.W.2d at 503.[5]

### 2. Phantom Equity Agreement and the Sale of Modern EPC Promise

Next, we turn to the remaining alleged agreements. Appellees assert that such a promise to pay appellants a commission was illusory and conditioned upon appellants' at-will employment, which was terminated prior to any conditions precedents of the agreement being met. Again, we agree.

At-will employees may contract with their employers on any matter except those which would limit the ability of either employer or employee to terminate the employment at will. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994), *abrogated on other grounds by Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773–75 (Tex.

---

[5] Appellants argue in their brief that the Statute of Frauds is inapplicable because more than a scintilla of evidence shows that an agreement could be performed within one year—for example, "Modern EPC could have had financial difficulties within one year of [appellee's] promises." Even assuming without deciding that the oral employment agreement at issue is performable within one year, we agree with appellees that such an alternative argument undermines appellants' main argument that a five-year employment contract existed.

2011). Consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment. *Light*, 883 S.W.2d at 644. Such a promise would be illusory because it fails to bind the promisor who always retains the option of discontinuing employment in lieu of performance. *Id.* at 645. When illusory promises are all that support a purported bilateral contract, there is no contract. *Id.*

Here, we are not dealing with a purported bilateral contract, but rather a unilateral one. A unilateral contract is created by a promisor promising a benefit if the promisee performs. *Vanegas v. Am. Energy Svs.*, 302 S.W.3d 299, 303 (Tex. 2009) (internal citations omitted). The contract becomes enforceable when the promisee performs. *Id.* In this case, the Phantom Equity Agreement vested a five-percent equity share in appellants, after they completed five years of employment with Modern EPC. This provision made the agreement a unilateral one because it was a promise to pay appellants after each had been employees for at least five years. *See Id.* (citing 2 JOSEPH M. PERILLO & HELEN HADJIYANNAKIS BENDER, CORBIN ON CONTRACTS § 6.2 (1995) ("[U]nilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for a stated period.")).

The Phantom Equity Agreement also made clear that: (1) the agreement is "meant to be an incentive [for appellants] to stay with Modern EPC for a minimum of 5 years;" (2) that appellants' employment status under the agreement remained at-will; and (3) in the event that Modern EPC was sold during the five-year vesting period, Wright and Murphy would be entitled to $1 million each. But whether the promise was illusory

12

at the time it was made is irrelevant; what matters is whether the promise became enforceable by the time of the breach. *Id.* We conclude that performance, on the appellants' part, did not take place in order to make the unilateral Phantom Equity Agreement enforceable because appellants were no longer employed by Modern EPC after May 2007, which preceded the five-year vesting date outlined in the agreement. Stated another way, we hold that the Phantom Equity Agreement is unenforceable as a matter of law because it is illusory and performance has not taken place.

Finally, appellees contend that the appellants' claim of a purported promise by appellees to pay each appellant $1 million following the sale of Modern EPC fails as a matter of law because the payouts were based upon conditions precedent that did not occur. Again, we agree.

A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Id.* In order to determine whether a condition precedent exists, the intention of the parties must be ascertained and that can be done only by looking at the entire contract. *Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Ordinarily, conditional language must be included to make performance specifically conditional. *Id.* If no such language is used, the terms will be construed as a covenant in order to prevent forfeiture. *Id.* Additionally, while

there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed. *Id.*

The following relevant portion of the Phantom Equity Agreement controls this issue:

**Change of Control (during the 5 year vesting period):**

Description: Qualifying Event: During the 5 year vesting period The Modern Group, Ltd sells a majority and controlling interest in Modern EPC, Inc. (this does not include a forced sell by our bank/financial institution)

— Qualifying event Payment: The greater of $1,000,000 (one million dollar [sic]) or the FMV (see definition above) of the 5%

— Payment will be made 90 days after the qualifying event

This provision expressly contains conditional language—i.e. "qualifying event"—which makes Modern EPC's obligation to pay Wright and Murphy $1 million specifically conditional upon the sale of a majority and controlling interest of Modern EPC, not by "forced sell by its bank or financial institution, during the five-year vesting period. The record is clear and undisputed that no sale took place, despite evidence that the sale of Modern EPC was being discussed, and even potentially being negotiated. Regardless, the "qualifying event," or condition precedent, did not occur to require performance or to have a contractual duty breached.[6] *See Hohenberg Bros. Co.*, 537 S.W.2d at 3.

---

[6] Appellants argue that even if the condition precedent did not occur in this case, it does not affect our analysis concerning anticipatory breach or repudiation by appellees. For support, appellants direct us to *Mar-Len, Inc. v. Gorman-Rupp Company*, 795 S.W.2d 880, 887 (Tex. App.—Beaumont 1990, writ denied) and *Carroll v. Wied*, 572 S.W.2d 93, 97 (Tex. App.—Corpus Christi 1978, no writ). We agree that both cases apply to an analysis of anticipatory breach or repudiation, but nothing in the record supports a

After viewing the entire record in the light most favorable to the appellants, indulging every reasonable inference and resolving any doubts against the motion for summary judgment, we hold for the foregoing reasons that the trial court did not err in granting appellees' summary judgment on appellants' breach of contract cause of action. Accordingly, we overrule appellants' sixth issue.

## B. Tortious Interference Claims

By their second issue, appellants assert that the trial court erred by granting summary judgment on their cause of action for tortious interference because it was not challenged in appellees' motion for summary judgment. Appellants contend that they pleaded a cause of action for tortious interference in their live petition. Appellees argue that appellants never pleaded a cause of action for tortious interference with a contract.

Appellants' live pleading shows that eight separate "counts," or causes of actions, were pleaded, including one for breach of contract. Under a heading entitled "Pleading to the Court, Only" embedded in the pleading of appellants' breach of contract action, appellants inserted the following statement:

> Such action on the part of the [appellees] not only constituted a breach, anticipatory breach, and/or repudiation of the oral and written contracts which the Defendants had with Wright and Murphy, but in addition, such action on the part of the Crenshaws/Modern also tortiously interfered with

---

reason for such an analysis to take place in this case. Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance. *Van Polen v. Wisch*, 20 S.W.3d 510, 516 (Tex. App.—Houston [1st Dist.] 2000, pet denied).

Nothing in the record supports the theory by appellants that appellees anticipatorily breached or repudiated the contract to sell because there was no obligation to sell Modern EPC during the five-year vesting period. The Phantom Equity Agreement is clear and undisputed that the decision to sell Modern EPC during the five-year vesting period rested solely with The Modern Group, Ltd. Accordingly, appellants' argument fails.

Wright and Murphy receiving the $2,000,000 to which they were contractually entitled, and would have received, but for the intentional acts of Defendants, including tortious acts, which effectively made the sale of Modern EPC impossible at that time.

As a general rule, parties should give a "short statement of the cause of action [pleaded] sufficient to give fair notice of the claim involved." *See* TEX. R. CIV. P. 47(a). In determining whether a cause of action was plead, plaintiff's pleadings must be adequate for the court to be able, from an examination of the plaintiff's pleadings alone, to ascertain with reasonable certainty and without resorting to outside information the elements of plaintiff's cause of action and the relief sought with sufficient information upon which to base a judgment. *Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex. 1979). Furthermore, each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth. TEX. R. CIV. P. 50.

Assuming *arguendo* that appellants pleaded a cause of action for tortious interference in their live petition, such a claim would have failed as a matter of law. The elements of a cause of action for tortious interference with a contract are: (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995). As discussed in Part III-A of this opinion, appellants cannot establish that an enforceable contract existed that would satisfy the first element of a tortious interference cause of action. Accordingly, even if the trial court erroneously

16

granted summary judgment on that particular cause of action, such error was not reversible because the record conclusively disproves the existence of an enforceable contract to support a tortious interference action. *See id.*; TEX. R. APP. P. 44.1(a). Appellants' second issue is overruled.

## C. Promissory Estoppel Claims

By their third issue, appellants argue that the trial court erred in granting summary judgment against their promissory estoppel claims pursuant to appellees' impermissible demurrer. Appellees asserted in their motion for summary judgment, and contend again on appeal, that promissory estoppel is solely a defensive claim and cannot serve as a basis for affirmative relief.

We first address appellants' general demurrer argument. The rules of civil procedure state that general demurrers shall not be used. TEX. R. CIV. P. 90. Instead, the rule requires a party to file written special exceptions pointing out every defect, omission, or fault in a pleading either in form or in substance. *Id.* Appellees assert that appellants waived this argument on appeal because it was not raised before the trial court. We agree. To preserve error for appellate review, a complaint must be made to the trial court by a timely request, objection, or motion that specifically states the grounds for the ruling that the complaining party sought from the trial court, and the trial court must rule or refuse to on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a). We find that appellants did not properly preserve error for review on this issue. *See Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990).

Even assuming without deciding that appellants properly preserved error, we

17

would find such error harmless because promissory estoppel is defensive only and cannot constitute a basis for affirmative relief.[7]  *See Stanley v. CitiFinancial Mortg. Co., Inc.*, 121 S.W.3d 811, 820 (Tex. App.—Beaumont 2003, pet. denied).  We overrule appellants' third issue.

## D.    Fraud

By their fourth issue, appellants contend that appellees failed to carry their summary judgment burden to conclusively negate all of appellants' fraud claims. Appellants asserted a cause of action for common law fraud and fraudulent inducement regarding various "false and fraudulent" "promises, representations, and assurances" made by appellees to appellants.[8]

Appellees first argue that appellants' claims for fraudulent inducement fail as a matter of law because all of the alleged agreements at issue are unenforceable.[9]  We agree.  Proof that a party relied to its detriment on an alleged misrepresentation is an essential element of a fraud claim.  *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex.

---

[7] Because this case was transferred from our sister court in Beaumont, we decide it in accordance with the precedent of that court, but we note that the outcome would have been different had we not been required to decide this case pursuant to the Beaumont court's precedent.  *See* TEX. R. APP. P. 41.3; *see, e.g., Reyna v. First Nat. Bank in Edinburg*, 55 S.W.3d 58, 70 n. 4 (Tex. App.—Corpus Christi 2001, no pet.) (recognizing promissory estoppel as a valid cause of action for affirmative relief).

[8] Appellants' live petition asserts separate claims for common law fraud as well as fraud in the inducement.  The elements to prove each claim, however, are the same.  *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990) (stating that the elements for a fraudulent inducement claim are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury).

[9] We disagree with appellants' assertion that this argument was not raised by appellees at the trial court, and therefore, cannot be grounds for affirmance.  The record shows that similar arguments were made by appellees in their motion for summary judgment.

18

2001). However, without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim. *Id.* In other words, when a party has not incurred a contractual obligation, it has not been induced to do anything. *See id.* By applying our reasoning set forth in Part III-A of this opinion, we conclude that the lack of any contractual obligation is fatal to appellants' fraudulent inducement claims. *See id.*

Appellants rely on *Spoljaric v. Percival Tours, Inc.* to argue that an at-will employee is not barred from suing an employer for fraudulent inducement.[10] 708 S.W.2d 432, 434–35 (Tex. 1986). While *Spoljaric's* holding may lend support to appellants' contention, it is nevertheless distinguishable from the present appeal because in *Spoljaric*, the court held that the parties agreed to a bonus plan, which defeats the detrimental reliance issue addressed in *Haase*. *See id.* Here, however, there was no such promise to pay appellants $1 million each without the sale of Modern EPC. As set forth above, such a promise was conditional and that condition did not occur so as to require performance or to impose a contractual duty on appellees, such that it supported appellants' argument of detrimental reliance.

Therefore, after viewing the entire record in the light most favorable to the appellants, we conclude that because no enforceable contracts or promises existed to create detrimental reliance, appellants' fraud claims fail as a matter of law. We overrule appellants' fourth issue.

---

[10] At the time that this opinion was authored, the Texas Supreme Court was considering two certified questions from the United States Court of Appeals for the Fifth Circuit. *See Sawyer et al. v. E.I. DuPont de Nemours & Co.*, Cause No. 12-0626. The relevant question submitted was whether at-will employees may bring fraud claims against their employer for loss of their employment. The Texas Supreme Court held oral argument on February 26, 2013 on the case, but has yet to issue a decision.

**E.    Statutory Fraud**

By their fifth issue, appellants assert that the trial court reversibly erred by granting the motion for summary judgment on their statutory fraud claims.

The relevant portion of section 27.01 of the business and commerce code states that fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a:

(1)    false representation of a past or existing material fact, when the false representation is

    (A)    made to a person for the purpose of inducing that person to enter into a contract; and

    (B)    relied on by that person in entering into that contract; or

(2)    false promise to do an act, when the false promise is

    (A) material;

    (B) made with the intention of not fulfilling it;

    (C) made to a person for the purpose of inducing that person to enter into a contract; and

    (D) relied on by that person in entering into that contract.

TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2009).

Appellants allege that Modern EPC promised them five-percent each in Modern EPC stock, but such a promise was false and fraudulent to hold appellees liable under section 27.01.   Appellees argue that section 27.01 does not apply to appellants' statutory fraud claims because the stock involved was unvested and subject to a condition precedent that did not occur.   We agree with appellees.

Both Houston courts of appeals have held that stock options must vest in order to make section 27.01 an applicable cause of action. *See Beebe v. Compaq*, 940 S.W.2d 304, 307 (Tex. App.—Houston [14th Dist.] 1997, no writ) (citing *Stephanz v. Laird*, 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied)). The record contains undisputed evidence that the five-percent share of stocks were to vest in Wright and Murphy once each had completed five years of employment with Modern EPC or The Modern Group, Ltd. Further, it is clear from the record that the stocks did not vest because Modern EPC was shut down prior to the completion of the five-year vesting period.[11] Because appellants' stocks did not vest, appellants cannot, as a matter of law, maintain a cause of action under section 27.01 of the business and commerce code. *See Stephanz*, 846 S.W.2d at 905. We overrule appellants' fifth issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
30th day of August, 2013.

---

[11] Appellants attempt to make an argument that section 27.01 applies to cases in which a party to a contract involving stock or real estate partially performs and cite to *Wise v. Pena*, 552 S.W.2d 196, 202 (Tex. Civ. App.—Corpus Christi 1977, writ dism'd) for support. This argument was not made to the trial court, and we will not address it here. *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.").