ACCEPTED
12-14-00323-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
10/8/2015 10:52:32 AM
Pam Estes
CLERK

NO. 12-14-00323-CV

## IN THE
## TWELFTH COURT OF APPEALS
## TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/8/2015 10:52:32 AM
PAM ESTES
Clerk

_____

DAVID TUBB, ET AL.                                    APPELLANTS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/8/2015 10:52:32 AM

V.

ASPECT INTERNATIONAL, INC., ET AL.          APPELLEES
Clerk

_____

## BRIEF OF APPELLEES

_____


Keith Dollahite
State Bar No. 05958550
M. Keith Dollahite, P.C.
5457 Donnybrook Avenue
Tyler, Texas  75703

Trey Yarbrough
State Bar No. 22133500
Yarbrough Wilcox, PLLC
100 E. Ferguson, Suite 1015
Tyler, Texas 75702

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Objection to Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1.    James Sterling is a capable, honest, and ethical professional who provided
      valuable consulting services to David Tubb and Superior before this dispute
      arose.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.    James Sterling (on behalf of Aspect) and David Tubb (on behalf of Superior)
      entered into an oral agreement to manufacture and sell ammunition.. . . . . . . 4

3.    David Tubb was litigation-savvy when he entered into the oral Agreement with
      James Sterling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4.    From November 2011 through September 2012, James Sterling worked
      diligently with FillPro to design, assemble, and manufacture the equipment to
      produce ammunition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5.    James Sterling prepared the facility in Tyler for Aspect to manufacture
      ammunition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6.    In July 2012, James Sterling expressed his frustration that David Tubb had not
      finalized the written contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7.    In September 2012, James Sterling again attempted to get David Tubb to set
      up a corporation or limited liability company to carry out the terms of the
      Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8.  In October 2012, FillPro delivered the equipment to Aspect's facility in Tyler, which was fully functional and ready to produce ammunition. . . . . . . . . . 12

9.  James Sterling also performed substantial work to market the ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10. In November 2012, David Tubb started down a destructive path that ended in his repudiation of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11. In December 2012, David Tubb continued down his destructive path by refusing to sign a written contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12. In January 2013, David Tubb repudiated the Agreement by refusing to sign a written contract and by refusing to deliver the materials that Sterling needed to produce the ammunition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

13. In February 2013, Sterling's attorney sent a letter to Tubb acknowledging that Tubb had repudiated the Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.  Tubb and Superior failed to present a complete reporter's record; therefore, the Court must overrule their insufficiency of the evidence complaints. . . . . . 37

II. Legally sufficient evidence supports the trial court's finding that Tubb and Superior repudiated the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    A.  Tubb and Superior exaggerate the standard for proving repudiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.  The evidence supports the trial court's finding of repudiation. . . . . 43

        1.  The trial court made a broad finding of repudiation. . . . . . . . 43

2.  Tubb's destructive conduct in November 2012 evidenced Superior's repudiation of the Agreement. . . . . . . . . . . . . . . . 43

3.  Superior's refusal to supply the materials necessary to produce ammunition evidenced its repudiation of the Agreement. . . . 44

4.  Superior's refusal to enter into a written contract was a repudiation of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . 45

5.  Sterling acknowledged Tubb's repudiation of the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

6.  The Court should disregard the trial court's mistaken finding that Aspect did not have a license to manufacture ammunition. . . 47

III.   Legally sufficient evidence supports the trial court's award of restitution to Aspect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

A.   Well-settled legal principles support the trial court's award of restitution to Aspect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B.   The evidence supports the trial court's award of restitution. . . . . . . 48

1.  The evidence supports restitution based upon the value of the services provided to Superior. . . . . . . . . . . . . . . . . . . . . . . . 48

2.  The evidence also supports restitution based upon the value of the benefits conferred on Superior. . . . . . . . . . . . . . . . . . . . . . . 52

3.  Tubb and Superior did not prove and obtain findings on their defense of failure to mitigate damages. . . . . . . . . . . . . . . . . . 54

4.  Superior's request for a remittitur is likewise without merit. 55

5.  The Court should affirm the award of restitution. . . . . . . . . . 55

IV.     Superior cannot prove it had a partnership with Aspect as a matter of law. 56

V.      Superior cannot prove it is entitled to attorney's fees as a matter of law. . 58

        A.      The trial court found and concluded that Aspect did not breach the contract and that Superior is not entitled to attorney's fees.. . . . . . . . 58

        B.      Superior has not challenged the findings that Aspect did not breach the Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        C.      Superior has not challenged the implied findings that its attorney's fees were neither reasonable nor necessary.. . . . . . . . . . . . . . . . . . . . . . . 61

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Certificate of Compliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

# INDEX OF AUTHORITIES

Cases

*Abraxas Pet. Corp. v. Hornburg*, 20 S.W.3d 741 (Tex. App. – El Paso 2000, no pet.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Alamo Cmty. Coll. Dist. v. Miller*, 274 S.W.3d 779 (Tex. App. – San Antonio 2008,
no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802 (Tex. App. – Tyler 1999,
no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313 (Tex. App. –
Austin 1992, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60

*Coon v. Schoeneman*, 476 S.W.2d 439 (Tex. App. – Dallas 1972, writ ref'd n.r.e)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Crounse v. State Farm Mut. Auto. Ins. Co.*, 336 S.W.3d 717 (Tex. App. – Dallas
2010, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Englander Co. v. Kennedy*, 428 S.W.2d 806 (1968).. . . . . . . . . . . . . . . . . . . . 37, 38

*Great Am. Ins. v. North Austin MUD*, 908 S.W.2d 415 (Tex.1995).. . . . . . . . . . . 54

*Horner v. Heather*, 397 S.W.3d 321 (Tex. App. – Tyler 2013, no pet.). . . . . . . . . 1

*In re Estate of Arrendell*, 213 S.W.3d 496 (Tex. App. – Texarkana 2006, no pet.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

*Ingram v. Deere*, 288 S.W.3d 886 (Tex. 2009).. . . . . . . . . . . . . . . . . . . . . . . 56, 57

*Jordan v. Lyles*, 455 S.W.3d 785 (Tex. App. – Tyler 2015, __ ). . . . . . . . . . . . . . 2

*Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226 (Tex. 1990). . . . . . . . . . . . . . . 51-52

*Mar-Len of Louisiana, Inc. v. Gorman-Rupp Co.*, 795 S.W.2d 880 (Tex. App. – Beaumont 1990, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42

*Murray v. Crest Const., Inc.*, 900 S.W.2d 342 (Tex. 1995). . . . . . . . . . . . . . 40-41

*Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195 (Tex. 2004). . . . 59, 60-61

*Patton v. Loancare, LLC*, 2015 WL 5158396 (Tex. App. – Tyler 2015, ___). . . . 37

*Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097 (Tex. 1938). . . . . . . . . . . . . . . . 55

*Taveau v. Brenden*, 174 S.W.3d 873 (Tex. App. – Eastland 2005, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Wal-Mart Stores, Inc. v. McKenzie*, 22 S.W.3d 566 (Tex. App. – Eastland 2000, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Wheeler v. Greene*, 194 S.W.3d 1 (Tex. App. – Tyler 2006, no pet.). . . . . . . . . 37

Statutes

TEX. BUS. ORG. ACT §152.052, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-58

TEX. BUS. ORG. CODE §152.203(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 56, 57

TEX. CIV. PRAC. & REM. CODE §38.001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Rules

TEX. R. APP. P. 9.4(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

TEX. R. EVID. 803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. R. EVID. 1006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Other

49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE: CONTRACT LAW § 9.11
(2015)................................................... 40

6 ROY W. MCDONALD AND ELAINE A. GRAFTON CARLSON, TEXAS APPELLATE
        PRACTICE § 18:12, 33:16 (2d ed. 2015)..................... 1, 55, 60

# ISSUES PRESENTED

I.     Must the Court overrule Tubb and Superior's insufficiency of the evidence complaints because of their failure to present a complete reporter's record?

II.    Is the evidence legally sufficient to support the trial court's finding that Tubb and Superior repudiated the Agreement?

III.   Is the evidence legally sufficient to support the trial court's award of restitution to Aspect?

IV.    Can Superior prove it had a partnership with Aspect as a matter of law?

V.     Can Superior prove it is entitled to attorney's fees as a matter of law?

## STANDARD OF REVIEW

Because the trial was non-jury, the following principles govern this appeal:

- "When considering a legal sufficiency challenge after a bench trial, we view the evidence in the light most favorable to the trial court's findings, crediting favorable evidence if reasonable fact finders could, and disregarding contrary evidence unless reasonable fact finders could not."

- "We must indulge every reasonable inference that would support the trial court's findings."

*Horner v. Heather*, 397 S.W.3d 321, 324-325 (Tex. App. – Tyler 2013, no pet.).[1]

At the conclusion of the trial, the district court made 62 findings of fact, some of which contain multiple subparts (4 CR 452-467). In their appellate brief, Tubb and Superior challenge only 13 findings and do so by legal insufficiency complaints: findings #11-#18, #33-#35, and #40-#41 (Appellants' Brief at pgs. 10, 35, 37, 39, 44). As a result, the remaining unchallenged findings are now binding in this appeal. 6 ROY W. MCDONALD AND ELAINE A. GRAFTON CARLSON, TEXAS APPELLATE PRACTICE § 18:12 (2d ed. 2015).[2] These unchallenged findings are presented in the statement of facts below.

---

[1] Internal quotations and citations are omitted throughout this brief.

[2] Emphasis is added throughout unless indicated otherwise.

## OBJECTION TO STATEMENT OF FACTS

In considering Tubb and Superior's legal insufficiency complaints, the Court must consider only the evidence and inferences that *support* the trial court's findings and must disregard all other evidence and inferences. *Jordan v. Lyles*, 455 S.W.3d 785, 791 (Tex. App. – Tyler 2015, __ ). But Tubb and Superior's statement of facts turns this rule upside down. They present only their version of the story that *does not support* the trial court's challenged findings – the same story the trial court rejected in making those findings. In effect, Tubb and Superior ask the Court to try the case a second time, which of course it cannot do. As shown below, Tubb and Superior also ignore evidence that amply supports the challenged findings, including indisputable emails and transcripts of recorded telephone calls. For these reasons, Sterling and Aspect object to Tubb and Superior's statement of facts in its entirety and submit the following one so the Court can perform its duty to consider only the evidence that supports the challenged findings and to disregard all contrary evidence and inferences.

## STATEMENT OF FACTS

1. <u>James Sterling is a capable, honest, and ethical professional who provided valuable consulting services to David Tubb and Superior before this dispute arose.</u>

Before Aspect and Superior entered into the oral agreement that is the subject of this case, James Sterling provided valuable information technology consulting services to Superior. In finding #7, the trial court found:

> Sterling was hired in 2006 by Tubb and Superior and over the next three to five years computerized Superior's sales operation and provided other IT consulting services, including the creation or upgrade of the company's website. Tubb testified that Sterling's services enhanced the overall operation of Superior and made the company more efficient. Tubb acknowledged that Sterling made Superior better than it was before and that he was "real helpful."

(4 CR 453). This finding is unchallenged and is therefore binding. All the witnesses agreed to this fact in their testimony (4 RR 60-81; 6 RR 162-164; 7 RR 168; 8 RR 18, 44). In fact, the evidence proved that between the time Sterling set up Superior's website and the trial, Superior had already made about $4 million in product sales (4 RR 83, 118).

James Sterling was honest, ethical, and trustworthy in his dealings with David Tubb and Superior. In finding #8, the trial court found:

Sterling had access to Superior's computer network and the company's books, and was entrusted with a company credit card while performing the foregoing services. Tubb was not aware of Sterling ever engaging in any unethical conduct or doing anything detrimental to the company during that period, and Sterling demonstrated competency in computers and information technology.

(4 CR 453-454). This finding is also unchallenged and binding. The evidence supports this finding (4 RR 60-81; 6 RR 165-166; 7 RR 77; 8 RR 108-109). Consequently, the Court must disregard Tubb and Superior's groundless personal attacks against James Sterling and their deplorable name-calling (Appellants' Brief at pgs. 7-8, 44).

2.  <u>James Sterling (on behalf of Aspect) and David Tubb (on behalf of Superior) entered into an oral agreement to manufacture and sell ammunition.</u>

In finding #9, the trial court found:

In the latter part of 2011, Sterling and Tubb discussed collaborating together to manufacture and sell small arms ammunition. As a result of those discussions, [Aspect] and Superior ... entered into an agreement to manufacture and sell small arms ammunition (the "Agreement").

(4 CR 453-454). In finding #10, the trial court found these were the material terms of the Agreement:

a.  Superior's agreement to contribute the equipment and materials necessary for the enterprise's viability and success;

4

b. Tubb's name ... would be used by the business for marketing purposes and Superior would market the products through its existing distributors;

c. Aspect ... would be entrusted with the manufacturing operation of the business, and perform the labor and work necessary to bring the product to market; more specifically, [Aspect], through Sterling, would use its computer and business skills to procure a manufacturing solution, coordinate the overall design and assembly of the loading equipment and operation, initially provide the location for the manufacturing operation and storage of materials, and ... the sale of the finished product;

d. Tyler, Texas would serve as the original location for the manufacturing operation;

e. The parties would share equally in the profits of the enterprise.

f. Tubb and Superior would assist with input in the design of the system and accuracy details for the high precision ammunition; and

g. Sterling would contribute his IT receivable owed to him by Superior in the amount of $35,019.00 to the venture.

(4 CR 454-455). These finding are unchallenged, binding, and supported by the record (4 RR 85-89; 6 RR 168-173).

Tubb and Superior now say in their brief that "Judge Russell found the parties had a contract (which was **uncontested**) ..." (Appellants' Brief at pg. x). But they have not always told the truth about the Agreement. Earlier in the case, in answers to interrogatories, David Tubb swore *eight times* under oath that the parties "were not able to reach an agreement on the terms of the joint venture ... and did not enter into a joint venture ..." and that "the parties did not reach any agreements ..." (PX-59 at pgs. 5-10; 4 RR 57).

Thereafter, Tubb and Superior fired their lawyer and hired new ones. The new lawyers then served amended answers to interrogatories, which erased all of Tubb's prior sworn statements that Superior never entered into an agreement with Aspect (PX 60; 4 RR 57). The new attorneys also filed an amended answer in which Tubb and Superior changed their story: they finally admitted that Superior did in fact enter into an oral agreement with Aspect, but claimed for the first time that the agreement created a *general partnership* (1 CR 141).

Why did Tubb change his sworn answers to interrogatories? Because TEX. BUS. ORG. CODE §152.203(c) provides that a "partner is not entitled to receive compensation for services performed for a partnership...." Thus, Tubb changed his sworn answers to manufacture a defense to Sterling and Aspect's claim for restitution (2 CR 240). Tubb testified at trial that when he swore *eight times* under oath that he

never entered into an agreement with Sterling, he "was mistaken at that point ... [a]ccording to my current counsel" (6 RR 182). Tubb testified: "I didn't understand what I was talking about" and when he hired new counsel, they "educated me and directed me on the sort of arrangement that we had" (7 RR 71).

3.      David Tubb was litigation-savvy when he entered into the oral Agreement with James Sterling.

When David Tubb made the Agreement, his company Superior was the plaintiff in a pending federal lawsuit against Brand Cole, Superior's former employee. In its lawsuit against Cole, Superior alleged that Tubb had invented an improved rifle scope; that Tubb had assigned his rights to the invention to Superior; and that Brand Cole was trying to steal the rights to the invention (PX-74-78; 4 RR 57; 6 RR 160). Tubb testified in this case that he ended up with the better end of the deal with Cole because he "owned the equipment and the facility" (6 RR 161). In the federal case, Brand Cole had alleged a counterclaim against Superior for breach of contract, to which Superior had raised a number of affirmative defenses (PX-77 at pg. 4; 4 RR 57). From this evidence, the trial court in this case could have reasonably inferred that before he entered into the Agreement with James Sterling, David Tubb had already received an education on contract law – e.g., if you never sign a written contract, you may never have to honor your oral agreement with someone.

7

4.     From November 2011 through September 2012, James Sterling worked diligently with FillPro to design, assemble, and manufacture the equipment to produce ammunition.

Aspect agreed to do everything from finding the right equipment and manufacturing the ammunition to designing the packaging and getting the product to market (4 RR 92-93). This was "an enormous task" and "[n]ormally, you'd have to hire a firm and spend a lot of money to have a professional do it" (4 RR 93). After researching sources for the equipment, Sterling identified and began working with FillPro, Inc., in Golden, Colorado, to design and build equipment that would load both precision and non-precision ammo (4 RR 91-92). James Sterling and David Tubb flew to FillPro's office in Colorado and met with the company's owner, sales manager, and a number of engineers (4 RR 94). The plan was to make a commercial line for non-precision ammunition and a contract line for precision ammunition (4 RR 97).

Sterling was intrigued with the idea of using a model 1050 machine – an off-the-shelf product – and then modifying it to make it computer-controlled. FillPro understood the equipment had to operate fast and at a high volume to make it viable, so they proceeded to design a machine that would do that. One model 1050 would not be fast enough, so Sterling came up with the idea of having one industrial computer control two model 1050 machines. The design "pretty much required [Sterling's]

8

input almost every day ..." (4 RR 95-97). Sterling was on the phone every day, either talking with FillPro, talking with Tubb, or talking with others about getting the product to market. He worked full time on the project (4 RR 98-99).

The record contains 75 pages of FillPro quotations, component descriptions and photographs, specifications, technical drawings, contract terms, and revisions for the sophisticated equipment to make ammunition. The first quotation is dated November 19, 2011, and the last is dated September 11, 2012 (PX-52; 4 RR 57). These documents evidence the tremendous amount of work that Sterling performed in moving the project from its initial conceptual stage to its final stage – the installation of the unique and highly-sophisticated equipment that was ready to produce ammunition in a manner superior to that of competitors.

Rue Marshall was FillPro's manager of customer service and quality assurance at the time (4 RR 144). Marshall testified at trial that FillPro's primary contact for the project was James Sterling and that FillPro had minimal contact with David Tubb. Marshall also testified that this type of equipment is typically purchased by a large company, which would have an entire committee of engineers, technicians, and production employees perform the work that James Sterling performed alone on this project (4 RR 149-150). Marshall testified that Sterling's investment of time and effort in the project was substantial (4 RR 152-153).

9

5.  <u>James Sterling prepared the facility in Tyler for Aspect to manufacture ammunition.</u>

Aspect prepared the manufacturing facility on Sterling's property by converting his detached garage into a lab and production facility. He installed the electrical, including computer wiring and an alarm system. The FillPro equipment required a temperature-stable environment, so heating and air conditioning equipment was installed. The equipment would be air-driven, so Sterling installed custom air lines into the walls to operate the equipment. A contractor did the sheetrock and painting; Sterling and his neighbor did the rest of the work. To avoid a safety problem from static electricity, he put down a polymer floor like the ones used in aircraft hangers, which required special floor preparation. Sterling installed a computer system in the office, integrated with his network for the company, and an IP phone system with a company phone line. The system was tied to security cameras on the property (4 RR 100-103). Photographs depict the work performed to prepare the facility for the production equipment (PX-3 to PX-22; 4 RR 101-103). Sterling worked constantly to make the facility ready for FillPro to deliver the equipment at the end of October 2012 (4 RR 103). A federal ATF agent inspected the facility and approved Aspect's application for the license that authorized Aspect to manufacture and sell ammunition there (4 RR 67).

6.      In July 2012, James Sterling expressed his frustration that David Tubb had not finalized the written contract.

Sterling had asked Tubb on "numerous occasions" for them to sign a written contract confirming the Agreement, without success (4 RR 120). Sterling sent a draft of a written contract to Tubb. On July 13 – eight months after Sterling entered into and began performing under the oral Agreement with Tubb – Tubb's lawyer proposed fundamental changes to the oral Agreement. Tubb's lawyer suggested that "Superior simply lease the equipment and sell the supplies to Aspect," and for Aspect to then load the ammunition and sell it back to Superior (PX-82; 4 RR 57). Tubb sent his lawyer's proposed changes to Sterling (PX-82; 4 RR 57). In response, Sterling expressed his frustration that "we're approaching legal agreements very late in the game," asked to "keep good lines of communication open," and expressed his attitude of cooperation, despite Tubb's attempt to change the Agreement under which Sterling had been performing for the prior eight months (PX-82; 4 RR 57).

7.      In September 2012, James Sterling again attempted to get David Tubb to set up a corporation or limited liability company to carry out the terms of the Agreement.

On September 14, Sterling emailed a revised draft of his proposed written contract to Tubb (DX-2; 4 RR 57). In the blank for the name of the company, Sterling inserted the words "CORP OR LLC TO BE DETERMINED," thereby indicating the

entity would *not* be a partnership (PX-1 at pg. 1; 4 RR 57, 120-121). Sterling

testified: "From the beginning, we talked about this being an LLC or a C corp," and

"that this was going to be held in some kind of corporate structure" (4 RR 117; PX-88; 4 RR 57).

8.     In October 2012, FillPro delivered the equipment to Aspect's facility in Tyler, which was fully functional and ready to produce ammunition.

FillPro delivered the production equipment to Aspect's facility in Tyler in late

October of 2012. Rue Marshall from FillPro came to Aspect's facility to install and

certify the equipment (4 RR 144). Marshall stayed in Tyler for several days to train

Sterling and to work out any bugs (4 RR 116). Marshall noted that Aspect's facility

"was incredibly stable," as required to operate the equipment (4 RR 114). A

photograph depicts the unpacking of the two large crates containing the equipment

(PX-25; 4 RR 111). Photographs also show the assembling of the equipment and the

completion of the installation, when the equipment was ready to go (PX-26, 27, 47;

4 RR 112, 145). The equipment included a control unit for the computer, a touch

screen monitor, a keypad, pressure regulators, pressure gauges, an emergency stop

button, two Dillon model 1050s (loading machines), and scales. The industry standard

for scales for ammo loading is plus or minus half a gram, and this equipment could

measure powder down to 1/100th of a gram (4 RR 113-114).

12

The equipment was distinctive because of its abilities to easily change calibers very quickly, to simultaneously load one caliber on one side and a different caliber on the other side with different specifications, and to sort ammunition through pressure sensors. Sterling was not aware of any other ammunition loading equipment of this nature (4 RR 115-116). Rue Marshall testified the equipment was distinctive: it was only "the second configuration manufactured in the weigh dump with the Dillon interface," and was a "[u]nique configuration" involving "a very complex process" (4 RR 148-149, 166-167).

A video shows the equipment operating (PX-54; 4 RR 123). Sterling tested the equipment, which produced 1,200 rounds per hour. The equipment was designed to run 24 hours per day. During the prior year, the major companies – such as Black Hills, Federal, and Winchester – had been running their production facilities 24/7 and were not able to keep up with the skyrocketing demand for ammunition. Sterling calculated the revenue that the equipment could generate based upon the following factors: (1) the cost of the component materials in a round of ammunition; (2) the number of rounds the machine could make based upon testing; and (3) running the machine 260 days a year instead of the industry standard of 365 days a year (or 8 hours a day instead of the industry standard 24 hours per day). At 1,200 rounds an hour on an 8 hour day production, with a gross profit of $1.67 per round, the machine

would produce $4.1 million in gross revenue (4 RR 127-129). Marshall agreed that the tested production rates in this calculation were "well within the capabilities of the equipment" (4 RR 155-156; Finding #38, 4 CR 460). In fact, David Tubb himself gave a YouTube interview and said the equipment could make a million rounds annually (6 RR 222).

In training Sterling on the equipment, Marshall found him "to be as bright as, certainly, anyone that I've ever trained," and "over the course of the months following installation, he definitely became an expert in this particular powder filling system configuration" (4 RR 151). When Rue Marshall left Aspect's facility, the equipment was installed, functional, and ready to load ammunition (4 RR 117; 8 RR 99; Finding #27, 4 CR 457). Marshall testified that when he left Tyler, the equipment was "absolutely production ready" (4 RR 162-163). Sterling testified that at that point, Aspect and Superior had still not entered into a written contract, "[b]ut not for [his] lack of trying" (4 RR 117).

9.    James Sterling also performed substantial work to market the ammunition.

Sterling did a great deal of work and research on packaging, which resulted in designs for packaging that was ready for selling ammunition (4 RR 104-105). Sterling also talked to Tubb's distributors about using bar codes. The distributors were having difficulty dealing with companies the size of Superior because they did not use bar

14

codes. Up until then, Tubb's company "was taking what little ammunition he was making and putting it in a generic 50-round box and putting a sticker on top of it and selling it from his website. And you can't be competitive, nationally, unless you have something that looks like everybody else's grade of products" (4 RR 106).

Sterling designed two boxes: one for regular supersonic ammunition and the other for subsonic ammunition for government contracts, since state governments were buying millions and millions of rounds of subsonic ammunition (4 RR 106-107). Texas passed a law making it legal to hunt feral hogs with suppressors or silencers, which increased the demand for subsonic ammunition (4 RR 107). Sterling's wife came up with the idea for the trademark "Absolute" and Tubb's attorney secured the trademark for the brand "Absolute" for Tubb (4 RR 107-108).

Sterling followed the prices for the cost of goods to make sure the prices for their ammunition would be competitive. With the FillPro equipment, Aspect would be able to produce a higher quality product at competitive prices (4 RR 109). Sterling determined that it would only cost $0.46 to $0.47 to manufacture a .308 cartridge, which they could sell for $2.00 a round (4 RR 110). The design of the FillPro equipment made it easy to change calibers so there was "really no reason for that machine to ever stop running. We can always be producing something" (4 RR 107).

Between early 2012, when the agreement was made with FillPro, to October 2012, when FillPro delivered the equipment, Sterling worked 10 hours a day, 7 days a week. "[Y]ou're thinking about your business from the time your feet hit the floor in the morning until you close your eyes at night. And then sometimes you get up at 3 in the morning with some more ideas and work a little bit more" (4 RR 110).

10. <u>In November 2012, David Tubb started down a destructive path that ended in his repudiation of the Agreement.</u>

Tubb and his wife planned to visit Sterling and his wife at their home in Tyler for the first time to see the operation of the equipment. Before their visit, Tubb left Sterling a telephone message saying he wanted to talk about the amount of money he had invested (4 RR 188-189). This gave Sterling "a little bit of trepidation" that "something might be wrong," so he sent Tubb an email saying "if you're thinking of dropping a bombshell surprise on me by attempting to change our agreement at the last minute, you've mistaken me for someone else. Surely that is not the case" (PX-120; 4 RR 57, 187). Within 15 minutes, Tubb called him "laughing" and said "Oh, no. We're not changing the deal. *You're doing all the work*" (4 RR 189). The Tubbs arrived in the evening, and Sterling and Tubb spent the next day working in the lab with the equipment (4 RR 190).

16

Sue Tubb – the wife of David Tubb – testified that the Sterlings welcomed them into their home, where they stayed for two or three nights (8 RR 25-26). Sue Tubb also testified she was "at odds" with her husband over his Agreement with Sterling (8 RR 21). She testified: "I'm married 32 years to David ... and when you're arguing and arguing ... I was absolutely galled [David Tubb] did not listen to me, multiple times. I was furious .... It got to the point where I thought James was David's mistress" (8 RR 43).

While staying with the Sterlings, Sue Tubb exchanged emails with her friend Marilyn Ault, who was Tubb's bookkeeper at the time. These emails made unfounded personal attacks against James Sterling and undermined the Agreement. In an email to Sue Tubb, Marilyn Ault raised concerns about the terms of the Agreement that Tubb had made with Sterling more than a year before and wrongfully attacked Sterling's integrity. Ault wrote Sue Tubb:

> *This is such a big deal* that I feel like I need to write almost a book... Perhaps the best thing we can do [is] for you and David to *learn as much as you can while you're there*, particularly addressing the most critical issues, and then maybe *we can meet and discuss it ....*
>
> I'm concerned most of all about the part of the agreement that says that Superior's duty is to provide capitalization for the venture as needed while Aspect will own 50% of the venture....

I'm also particularly concerned about that Aspect International website ... *It looks like it's setting David up for what I think you have rightly identified as a repeat of the Brandon Cole situation* [the pending lawsuit discussed above].... *And that smells of trying to wrest the entire project away from Tubb / Superior as soon as possible....*

I'm also concerned that Sterling has a homestead outside of Tyler ... with all of that equipment you've paid for and shipped down there ... *That would certainly complicate repossession if it comes to that....*

Sterling seemed to be very determined to push you in the direction of [other accountants who used the QuickBooks accounting software] and one of the reasons could be that he's wanting you to buy into some of other services that this conglomerate has to offer, *collecting unknown rewards for your doing so ....* With your income tax return in hand, and a joint venture agreement as well, *Sterling would be in a position to finance ... the "facilities" that he's going to put up based on your credit....*

(PX-104; 4 RR 57). Why would Ault make such defamatory statements about Sterling? The trial court could have reasonably inferred that Ault had an ax to grind because James Sterling had suggested using another bookkeeper who knew how to use the QuickBooks software that Sterling recommended, whereas Ault did not know how to use QuickBooks (4 RR 119). Sue Tubb testified that Sterling wanted her husband to use a different bookkeeper than Ault, and ultimately David Tubb did so (8 RR 25).

18

The next morning, Sue Tubb forwarded Ault's defamatory email to David

Tubb's out-of-state patent attorney (8 RR 31). She told her husband's attorney:

> Our accountant Marilyn Ault (20 years) sent this email to me. *David has read it.* My protective fear is my loving passionate husband may again have someone *"taking advantage of him."*

(PX-110, 121; 4 RR 57). While in Tyler, David Tubb showed James Sterling this

email on his wife's laptop (6 RR 219). Sterling "got a brief look at some of the parts

of it. And it confused me and further upset me" (4 RR 195). There was no basis for

her to say he would take advantage of Tubb (4 RR 195). Sterling knew that Tubb was

in litigation with Brand Cole and asked Tubb, "Did Mr. Cole ever get any profits

from the ammunition?" Tubb "just kind of smiled" and said "There never was any

profit to share" (4 RR 197).

Unbeknownst to Sterling, in response to Sue Tubb's email, on November 15,

Tubb's patent attorney recommended that David Tubb repudiate the oral Agreement

under which Sterling had already been performing for over a year. The attorney told

David Tubb that he shared Ault's "concerns," that any written contract should change

the "existing handshake agreement," and that Tubb should "keep ownership of all

[intellectual property rights], and license the Joint Venture" with Sterling so that

Tubb could later terminate the license and keep the rights to produce the ammunition

19

for himself (PX 110; 4 RR 57). Of course, that is exactly how Tubb got the best end of his business deal with Brand Cole (6 RR 161).

That evening, the Sterlings had a dinner in their home for the Tubbs and invited some friends, two of whom were law enforcement officers (4 RR 190-191). At one point, David Tubb "leaned back in his chair with his arms crossed" and said "[m]y felon son should be the one running this operation" (4 RR 191; 8 RR 61; 8 RR 105-108). David Tubb admitted at trial that he did this (6 RR 189; 7 RR 31). One of the police officers who was at the dinner testified he "was a little taken aback" and "a lot of eyes got wider ..." (8 RR 107). James Sterling testified he "was embarrassed. And then I started to feel really insulted because I'd spent over a year of my life working on this thing. And I couldn't understand where this was coming from. It was just a complete shock" (4 RR 191). "It was an extremely awkward moment" (4 RR 192).

The next morning, Sterling was the first one in the lab. Tubb walked in and said "[y]ou know, we're going to move this to Canadian [where Superior is located]. We'll move all this to Canadian" (4 RR 192; 6 RR 193). Tubb also said "You're a smoker, and you're going to be dead in two years. Number two, everything's going to break on the machine and you don't have any way to fix it" (4 RR 194; 8 RR 63). Sterling was "shocked and angry" and told him "[i]f you're going to do that, then you're going to need to at least pay me for my time that I've put in this thing" (4 RR

20

192-193). Sterling walked out to get some air, but later went back and worked on the equipment with Tubb. It "was pretty quiet and awkward" (4 RR 193).

Before Tubb left, they had a final conversation in which Tubb said "All this can stay here for now, but I want everybody to understand that everything in that garage belongs to me" (4 RR 201). In a follow up conversation, however, Tubb said the equipment must go to Canadian (4 RR 201; 6 RR 18). After the visit, Sterling "was in a state of trying to get my bearings ... and the realization that he wasn't going to do this deal, after all my work – and I wanted to try to salvage the deal" (4 RR 200-201). At that point, they were attacking Sterling's character and talking about taking possession of the equipment. "And they had already made up their mind, from what I saw" (4 RR 202). This made it even more important to Sterling to get Tubb to sign a written contract (4 RR 202-203).

11.   <u>In December 2012, David Tubb continued down his destructive path by refusing to sign a written contract.</u>

On December 24, David Tubb emailed his Texas attorney and asked for his help with a written contract. Tubb finally forwarded his attorney in Texas an email – now a month old – from his out-of-state patent attorney, who had indicated Tubb needed to have an attorney in Texas prepare either a partnership agreement, a corporate operating agreement, or a limited liability company agreement to carry out

21

the terms of his oral Agreement with Sterling (PX-108; 4 RR 57). Later that day,

James Sterling emailed David Tubb, expressing concerns about Tubb's "outbursts,"

personal and professional "insults," and "disparaging remarks:"

> Since you commented recently that "communication" was key in avoid conflict, I want to take the opportunity to contribute. I don't know where these *outbursts* from your end are originating, but it happened on 12/19/12 and on your visit to Tyler on 11/14/12.
>
> You've been *insulting me personally and professionally* even while staying as a guest in my own home. On 11/14/12, you stated your intention to break your agreement. Within 24 hours you reversed your decision. Since then there have been *numerous outbursts*. This is very destructive to our friendship and professional relationship. *Please, it must stop*. I have done so much for you over the years and for whatever reason that I cannot fathom, you won't acknowledge or appreciate it. And somehow, starting in November, you've made it very clear that I'm suddenly someone who cannot be trusted. I don't know where this came from.... You showed me an email from your accountant to you, whereby you obviously asked her to investigate my company. I was stunned.... *Every decision you've made since has delayed production....*
>
> Since 11/14/12, I also hear *disparaging remarks* you repeat, made by others that do not know me or my history with you.... I don't understand this and it really disappoints me.... *From this side it appears that you may deem it necessary to portray me as a bad guy in order to justify any actions you may take....*

(PX-99, 4 RR 57).

Sterling then indicated he intended for Aspect to abide by the Agreement and he expected Tubb and Superior to do the same:

> Let me be clear about this. Absolutely nothing has changed on my end or my intentions. I abide by our agreement and *I expect you to do the same*. Anything else could cause both of us to lose our investments and future profits. I want this venture to be successful and profitable.

(PX-99, 4 RR 57).

Finally, Sterling confirmed that despite the delays caused by Tubb, Aspect was ready to produce ammunition if Superior would supply the materials as Tubb had promised to do under their Agreement:

> *We are almost at a point whereby we can at long last get a product to market* and you can recoup much of your expense.... I brought this idea to you over a year ago and have been working on it full time since. Rather than trying to collect unpaid consulting fees I told you that I would set those aside as equity in the joint venture. ...
>
> It has been difficult to wait through *delays* that may have been avoided. *Any materials you can send me I will load and ship out for sale.* We will divide the profits. Right now there is a tremendous demand and I've pointed out that even remanufactured ammunition in 223 of "any" kind could be profitable.

(PX-99, 4 RR 57).

Two days later, on December 26, Tubb emailed his lawyer's comments about the written contract to Sterling. The lawyer's comments clearly revealed three things to Sterling:

- Tubb had failed to make any effort to finalize a written contract during the prior six months.

- It was possible to carry out the terms of the Agreement through the creation of a limited liability company, just as Sterling had originally suggested to Tubb, which Tubb had previously denied, claiming his attorney had told him a "joint venture is illegal in the State of Texas" (4 RR 120-121, 217).

- Tubb had actually known this for the last ten months – since his lawyer had sent him a limited liability company agreement in February 2012 – but Tubb had never disclosed this fact to Sterling (4 RR 217).

The email from Tubb's attorney to Tubb stated:

> *When we last communicated on this (July) the plan was for a leasing arrangement* so as to minimize the risk to each party and maintain the separate nature....
>
> What I see now appears to be a completely different transaction.... *This bring us back to what we discussed initially in February of 2012, a limited liability company (LLC).* An LLC can accomplish what you are wanting to do with the proposal Joint Venture, but from the safety of the joint transaction being conducted as a separate business entity with limited liability (at least to the extent that the law permits) for both your company and Mr. Sterling's....
>
> To give you a better idea of what we are looking at, I am attaching the draft Company Agreement that *we prepared back in February*....

24

(PX-100; 4 RR 57).

Three days later, on the morning of December 29, James Sterling sent an email to his own attorney, David Griffith. Sterling intended for the email to be a privileged communication with his attorney, but inadvertently sent a copy of the email to David Tubb. Despite the fact that the email was obviously not intended for him, Tubb did not inform Sterling of this mistake (6 RR 22, 125-126). Sterling's email, however, provides evidence of Tubb's continuing game of stringing along Sterling by refusing to sign a written contract. Sterling wrote his attorney:

> My first thoughts after our meeting are that I wish the conflict had never happened and we had gone ahead to a profitable enterprise as agreed. I think that his email today indicates that he wants to continue but *now there are too many unresolved issues and I've been strung along like this from the beginning. If I want out of it, my option is simply to send him a bill and then pursue it.* I don't know what will happen with the machine and materials on hand, unless I could attach it. ...

(DX-11; 4 RR 57).

Later that day, on December 29, Sterling asked Tubb to meet and try to salvage the Agreement by entering into a written contract. In his email, copied to his own attorney, Sterling wrote:

> I've been candid in what the options may be on both your side and mine. I think what we are arguing about is senseless as *we both risk losing our investments and the*

25

> *profits we are about to realize*. I think you would like to continue to do business and I would like to do whatever I can to save this deal. My attorney thinks we should *meet face to face at a neutral location to construct a proper contract*. I'll wait for your reply.

(PX-109; 4 RR 57).

Two days later, on December 31, James Sterling had a telephone conversation with David Tubb, which he recorded. A transcript of the call was admitted into evidence (PX-55; 12/31/12; 4 RR 57). The conversation reflects Tubb's continual delay and refusal to sign a written contract:

Tubb:       As far a meeting face-to-face, I think that's a great plan ... I"m planning to go to [a gun] show for a day or two ... in Dallas (PX-55; 12/31/12 at pg. 2).

Sterling:   [I'll] get my attorney over there and try to hammer something out and, you know, move on with this deal (PX-55; 12/31/12 at pg. 3).

Tubb:       ... I sent you an agreement .... (PX-55; 12/31/12 at pg. 7).

            [I]f you are bringing your attorney ... *I don't know if that's good or bad.*

Sterling:   ... I think that probably you should have your attorney there too ....

Tubb:       *I know that won't work* ...  (PX-55; 12/31/12 at pg. 8).

Sterling:   .... my attorney here is *the same attorney that I tried to have you meet with at the shot show last year*. ... That's how long this has been going on .... (PX-55; 12/31/12 at pg. 9).

Tubb:       ... *we need to get an agreement if we're going to move forward* on this .... (PX-55; 12/31/12 at pg. 10).

26

12. In January 2013, David Tubb repudiated the Agreement by refusing to sign a written contract and by refusing to deliver the materials that Sterling needed to produce the ammunition.

James Sterling had another telephone conversation with David Tubb on January 4, which he again recorded (PX-55; 01/04/13; 4 RR 57). The conversation indicates that if Tubb continued to refuse to sign a written contract, Sterling would treat his refusal as a repudiation of the Agreement:

Tubb: ... I'm down here for the [gun] show....

Sterling: ... the purpose of me trying to get together with you face-to-face is try to ... get my attorney over there and maybe *draw up some kind of agreement. But if we can't do that, then there's no sense in me coming over* (PX-55; 01/04/13 at pg. 2).

Sterling: ... I think that something has happened somewhere along the way and ... I don't think you're really happy and I don't want you to be unhappy...

Tubb: Sure, yeah.

Sterling: *So whatever we got to do here, we got to do* (PX-55; 01/04/13 at pg. 3).

Three days later, on January 7, James Sterling had another telephone conversation with David Tubb, which he again recorded (PX-55; 01/07/13; 4 RR 57). The conversation reflects that Tubb repudiated the Agreement by refusing to enter into a written contract. It also reflects Tubb's acknowledgment that Sterling's time on the project had value:

Tubb: ... [A]re you recording this?

27

Sterling: Yes, I am.

Tubb: ... I thought we ought to visit ... *you've invested a lot of time in this* ...

Sterling: I sure have (PX-55; 01/07/13 at pg. 2).

Sterling: My agreement was that I deferred all my time and expense as equity in the joint venture and so I was expecting to manufacture the ammunition per agreed for 50 percent of the net profit.

Tubb: Absolutely ... (PX-55; 01/07/13 at pg. 3).

Sterling: *... And if there is no joint venture then that doesn't apply*...(PX-55; 01/07/13 at pg. 4).

Tubb: So what is your time at this point? *What's the value of your time at this point in time?*

Sterling: *... I would have to total all of the time that I've invested in this, this year, but it's a high number.*

Tubb: *What's your hourly –* **what's your hourly rate, James?**

Sterling: It's $140 an hour ... (PX-55; 01/07/3 at pg. 5).

Sterling: *I guess you need to decide what you want to do....* I'm the manufacturer. *So if the machine goes to Canadian, then I'm no longer the manufacturer ...* (PX-55; 01/07/13 at pg. 11)

Tubb: ***Understood. I don't know, James, about that***.... (PX-55; 01/07/13 at pg. 11).

Sterling: *... [W]hat I wanted to hear is, James, how can I help you and what can I do to get us to get this product out the door and I haven't heard any of that. And it seems to be more of a conflict about where the machine is than anything else* (PX-55; 01/07/13 at pgs. 11-12).

Tubb:          ***I just don't know if I can afford you, James*** (PX-55; 01/07/13 at pg. 13).

Sterling:      So there's a lot of ... money that could be made right now *if we had the materials* ....  There's a lot of different things we could be doing because the machine should not be sitting idle in any way, shape, or form (PX-55; 01/07/13 at pg. 14).

Tubb:          I understand that. ... Never been an argument on my side at all. ... Well, ***let me give it some thought, James***....(PX-55; 01/07/13 at pg. 15).

Sterling:      And *I've been trying over and over again to get some agreement in writing so that we don't ... have these conflicts*.... you can't have it both ways. *Either we have ... an agreement or I'm just an hourly paid employee* ... You can't have it anywhere in between because I don't work for free... (PX-55; 01/07/13 at pg. 16).

Tubb:          ***Well, I'll give it some thought*** ... (PX-55; 01/07/13 at pg. 17).

Later that day, on January 7, Sterling sent an email to Tubb, with copies to his own attorney and Tubb's attorney. The email reflects Tubb's destructive actions to repudiate the Agreement. First, Sterling emphasized the urgency of Tubb signing a written contract – and if he refused to do so – that Sterling expected Tubb to pay him his prior invoice in the amount of $35,019, for Sterling's earlier work on Tubb's San Diego Media project (PX-106, 4 RR 57).

Second, Sterling made it clear that if Tubb continued to refuse to sign a written contract confirming the Agreement, Sterling would treat it as a repudiation:

> *Without a contract, I will not spend any further time on this matter* other than the time required to accept delivery of the

packaging already in process. The only way forward at this point is to formalize our agreement in a signed contract. I've emphasized the important of this as a good business practice for over a year now.

(PX-106, 4 RR 57).

The next day, on January 8, Sterling had another telephone conversation with Tubb (PX-55; 01/08/13; 4 RR 57). In the conversation, Tubb agreed he had an obligation to pay Sterling for the time he spent on the project if Tubb did not enter into a written contract.

Sterling: ... [M]y time has been applied to this joint venture as equity. You agreed to that. *If we're going to have a falling out, then it's going to get addressed because I work for a living. And I can't just set up an entire operation for you and then say ... you don't owe me anything....*

Tubb: I understand that. ***I agree, James.***

Sterling: *... [T]he only way we can move forward and you not pay me for my time this year is with a signed contract....* If that doesn't happen, then we're going to have a parting of the ways... (PX-55; 01/08/13 at pg. 7).

Tubb: *... **[Y]ou're worth 140 bucks an hour, 120 bucks an hour working on these QuickBooks and working on San Diego Media and all that stuff** ....*

Sterling: *I have literally thousands of hours of my time into this project. ... [I]f you want to have a parting of the ways, then you can get your equipment out of here and ... we can move on. ...*

Tubb: What would you prefer? (PX-55; 01/08/13 at pg. 8).

Sterling: I keep my word, David. ... Even if ... we've had some real problems ... I'm willing to move forward but *I'm not going to do it without some kind of written contract with you and we should have done that from the beginning* (PX-55; 01/08/13 at pgs. 8-9).

Tubb: **Yeah, we really should have.**

Sterling: I've said that over and over and over again ... (PX-55; 01/08/13 at pg. 9).

Tubb: ... [D]id you read that LLC, the one I sent you that came from Ruben?

Sterling: Yeah, it was blank so none of your agreement was in there. *So, yeah, an LLC would be fine but our agreement as we have documented it over the period of this last year would have to be put in there and agreed to by both sides.*

Tubb: That's right. **And that may be very hard for us to do. I don't know.** (PX-55; 01/08/13 at pg. 10).

Sterling: ... *Obviously my time is worth something. All right?*

Tubb: **I agree. There's no doubt about that, James, I agree** (PX-55; 01/08/13 at pg. 11).

Sterling: ... I'm not going to put myself in a position to where you hold all the assets and then I end up being some kind of employee even though I'm not. ... Because ... *my time ... does have value.*

Tubb: **It does** (PX-55; 01/08/13 at pg. 12).

Sterling: ... *I've always recommended C corp or an LLC and when you were here in Tyler, I told you that there's a reason you have a separate legal entity that holds the assets of the agreement....*

Tubb: ... [N]ext week I'm going to visit with several people. ... we can't make any money if we don't have product so ...

31

Sterling:     ... it's pretty much a golden opportunity *if you can get the materials*. ... whatever your time is worth, my time is worth, or your investment ... that's really pretty small change in the money that can be made here.

Tubb:          *I would agree* ...  (PX-55; 01/08/13 at pg. 13).

Sterling:     ... I don't want to fight with you, David. ... it upsets me ....

Tubb:          Okay. Well, I'll ring you tomorrow. Okay? (PX-55; 01/08/13 at pg. 14).

Sterling testified that Tubb resisted signing a written agreement and "knew what he was doing." "It was real obvious that they had made up their mind that they were going to end it" (4 RR 122).

Two weeks later, on January 24, Sterling had another telephone conversation with Tubb, which he recorded (PX-55; 01/08/13; 4 RR 57). In the conversation, Sterling caught Tubb in his lie about his purported efforts to get a supplier to ship materials to Sterling (PX-55; 01/24/13 at pgs. 4-6). Tubb had assured Sterling repeatedly, "Don't you worry about materials.  I have no problem getting materials," but Tubb never delivered the materials to make the cartridges (4 RR 205; 6 RR 12; 8 RR 74-75, 99). Tubb later said some brass showed up at the Superior facility in Canadian to make .223 caliber cartridges, but Tubb did not send it to Sterling. He refused to let Sterling be involved in product procurement and purposely shipped material to his Canadian address where he planned to move the equipment, while at the same time purposely frustrating Sterling (4 RR 210-211).

32

Sterling had managed to have a small quantity of bullets shipped to Aspect's facility in Tyler to use in making cartridges to sell. When he found out, Tubb used the ruse of wanting to modify those .308 bullets for subsonic use and had someone pick them up at Aspect and take them to Superior. Instead of returning the modified bullets to Aspect so it could manufacture cartridges, Tubb used the bullets to load cartridges himself on manual machines, packaged them in boxes, and sent them to his friend in Amarillo, Texas, who had a website called "Silenced America," so Tubb could sell them through his own company. Photos depict Tubb's sale of this product on the Silenced America website (PX-30, 31, 32; 4 RR 57, 208-214). This was a clear repudiation of the Agreement with Sterling.

Tubb admitted at trial that he did not deliver the materials for the bullets and packaging to Sterling until after the lawsuit was filed (7 RR 34, 55-58). Tubb and Superior judicially admit in their brief that "Superior failed to have all the raw materials to Tyler when Aspect finally was in position to go forward with commercial production" (Appellants' Brief at pg. 3). In addition, Tubb agreed to provide a bullet feeder for the equipment, then told Sterling one was not available from the supplier. Sterling himself ordered the bullet feeder from the supplier and had it delivered in two days (4 RR 204-205).

Tubb never signed a written contract, as Sterling had requested many times during the prior year. On January 29, Sterling sent an email to Superior's new IT consultant – with a copy to Tubb – confirming that Tubb had terminated Sterling's involvement in "all existing projects" (PX-102; 4 RR 57). Tubb's termination of Sterling's access to Superior's computer system told Sterling "I don't trust you anymore. You're out" (4 RR 203).

Later that day, James Sterling exchanged emails with Rue Marshall at FillPro, with whom he had worked diligently for the last year on the equipment. The day before, Marshall had emailed Sterling, indicating he assumed Aspect had already started producing ammunition (PX-113; 4 RR 57). Responding to the email, Sterling expressed his disappointment and indicated David Tubb had repudiated the Agreement by failing to supply materials (PX 113; 4 RR 57). Having worked closely with James Sterling on the project for more than a year, Rue Marshall knew first-hand the quality of Sterling's character and the tremendous effort he had put into the project. Marshall wrote back:

> In the short time I have known you there is no question that you are a man of honor. I too can be counted on when needed. It is unfortunate that you have not been able to make the progress you so deserve given the effort expended.

(PX 113; 4 RR 57). Marshall testified he understood that "things had gotten to the point where it didn't look like they were going to be able to work it out" (4 RR 177).

13. In <u>February 2013, Sterling's attorney sent a letter to Tubb acknowledging that Tubb had repudiated the Agreement.</u>

On February 5, the attorney for Sterling and Aspect wrote a demand letter to Tubb and Superior. At trial, Tubb and Superior themselves asked for the admission of the letter into evidence without any limitation on its probative use (DX-24; 4 RR 57). The letter states in relevant part:

> [Aspect] has at all times fully performed its obligations and agreements with respect to the joint venture. On the other hand, [Superior] has engaged in actions, or failed to act in such a way as to breach its obligations and agreements to [Aspect]. Your actions, or failure to act, and those of [Superior] amount to a *repudiation* of the venture and make it clear that you have no intention of abiding by the original agreement....
>
> In reliance upon the original promises and representations made by you and [Superior], Mr. Sterling and [Aspect] have expended an extraordinary amount of time and labor in this venture, working often from eight to twelve hours a day over more than a year. As a result of [Superior's] breach and repudiation of the agreements, [Aspect] has suffered damages in the amount of at least $315,984.20 in reasonable reliance on the subject representations and promises. Those damages comprise the amount of time expended, taking into account a reasonable and customary charge for the professional services furnished.

(DX-24; 4 RR 57).

35

## SUMMARY OF THE ARGUMENT

Two procedural problems doom Tubb and Superior's appeal. First, they rely on a reporter's record that omits testimony presented at trial by video deposition. Because of the incomplete record, the Court must overrule their complaints regarding the sufficiency of the evidence. Second, Tubb and Superior elected not to challenge a number of the trial court's findings of fact in their brief. Those unchallenged findings are now binding and support the final judgment.

Even if Tubb and Superior could overcome these procedural obstacles, they cannot prevail in their appeal. They must prove there is *no evidence* that (1) they repudiated the Agreement with Aspect and (2) Sterling provided valuable services in working in the business full-time for more than a year. They must also prove there *no evidence* (1) contrary to their claim that a partnership existed between Aspect and Superior and (2) contrary to their claim for attorney's fees. As explained below, the record contains substantial evidence that defeats their no evidence contentions, most of which they ignored in their brief. Considering only the evidence and inferences that support the trial court's findings, and disregarding all other evidence and inferences, the Court should affirm the trial court's judgment.

36

## ARGUMENT

I.    <u>Tubb and Superior failed to present a complete reporter's record; therefore, the Court must overrule their insufficiency of the evidence complaints.</u>

Eighteen times during the trial, counsel for Tubb and Superior played portions of a video deposition in open court, and in each instance, failed to have the court reporter record the testimony. Each time the court reporter wrote only the following in the record: "(Video deposition played.)" (5 RR 7, 8, 10, 37, 38, 46, 49-50, 58, 61; 6 RR 12, 20, 41, 42, 81). In *Englander Co. v. Kennedy*, 428 S.W.2d 806 (1968), after a nonjury trial, the trial court made findings of fact and conclusions of law in support of its judgment. The appellants appealed, but filed a partial reporter's record. In their brief, the appellants challenged the sufficiency of the evidence to support the trial court's findings. The Supreme Court held:

> The burden is upon a party appealing from a trial court judgment to show that the judgment is erroneous in order to obtain a reversal. When the complaint is that the evidence is factually or legally insufficient to support vital findings of fact, or that the evidence conclusively refutes vital findings, this burden cannot be discharged in the absence of a complete or an agreed statement of facts.

*Id.* at 806. This Court applies this rule. *Patton v. Loancare, LLC*, 2015 WL 5158396 (Tex. App. – Tyler 2015, ___); *Wheeler v. Greene*, 194 S.W.3d 1 (Tex. App. – Tyler 2006, no pet.).

37

The same defect of missing video deposition testimony also occurred in three other cases. In each case, the Court of Appeals held:

- The appellant has a duty to object at trial if the court reporter is not transcribing the testimony presented by video deposition.

- The appellant's failure to object at trial waives any complaint about the court reporter's not transcribing the testimony.

- As a result of the missing testimony, under *Englander Co. v. Kennedy*, the Court must overrule the appellant's legal and factual insufficiency complaints.

*In re Estate of Arrendell*, 213 S.W.3d 496 (Tex. App. – Texarkana 2006, no pet.);

*Taveau v. Brenden*, 174 S.W.3d 873 (Tex. App. – Eastland 2005, pet. denied);

*Wal-Mart Stores, Inc. v. McKenzie*, 22 S.W.3d 566 (Tex. App. – Eastland 2000, pet. denied).

Tubb and Superior did not offer the written transcript of the video deposition into evidence. The trial court did not admit the written transcript into evidence. Before trial, however, Sterling and Aspect attached part of the written transcript of the deposition to their designation of experts filed in the clerk's record (3 CR 51-91). Do the rules allow Tubb and Superior to cure their failure to have the court reporter transcribe the video deposition testimony at trial by (1) matching the page and line references for the video deposition in the *reporter's record* to (2) the page and line references to the part of the written deposition transcript previously filed in the

38

*clerk's record* but not offered into evidence? The answer is not clear. *See In re Estate of Arrendell*, 213 S.W.3d 496 (Tex. App. – Texarkana 2006, no pet).

Even if the rules allowed it, however, Tubb and Superior cannot use this method to cure their failure to have the court reporter transcribe the video deposition testimony. Only five of the eighteen references to the video deposition in the reporter's record are contained in the part of the written transcript of the deposition in the clerk's record (5 RR 37, 38, 46, 49-50, and 58). There are thirteen instances where video deposition testimony was played and the testimony does not otherwise appear in the record (5 RR 7, 8, 10, 61; 6 RR 12, 20, 41, 42, 81). Thus, most of the testimony they offered via video deposition is not found anywhere in the record.

In summary, Tubb and Superior did not object to the court reporter's failure to transcribe the testimony in the video deposition. They have failed to present a complete reporter's record. As a result, the Court must presume that the missing testimony supports the trial court's findings and overrule their sufficiency of the evidence complaints. This issue is dispositive of the entire appeal, since Tubb and Superior only present complaints regarding the sufficiency of the evidence. Nonetheless, the following sections of this brief present Sterling and Aspect's responses to the points raised by Tubb and Superior.

II.     Legally sufficient evidence supports the trial court's finding that Tubb and Superior repudiated the Agreement.

        A.     Tubb and Superior exaggerate the standard for proving repudiation.

In their brief, Tubb and Superior argue that repudiation "requires exacting circumstances" and presents "an especially difficult hurdle" (Appellants' Brief at pgs. 11-12). Their strategy is to make the legal standard for repudiation so impossibly high that no party could ever satisfy it. But the legal standard is not as high as they imagine. "To give rise to an anticipatory breach, a repudiation must be clear and unequivocal and must apply to the entire contract." 49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE: CONTRACT LAW § 9.11 (2015). "No bright line test exists for establishing when a party has repudiated a contract." *Id.* Ordinarily, this is simply a question for the trier of fact. *Id.* For example, in *Murray v. Crest Const., Inc.*, 900 S.W.2d 342 (Tex. 1995), a contractor hired a subcontractor to work on three construction projects. A dispute arose between them over payment on one project, which they resolved by the contractor executing a promissory note to pay the subcontractor on that project in exchange for the subcontractor's lien release. Thereafter, the contractor completed all three projects, but told the subcontractor it would not pay the note on the first project when it became due because the subcontractor had failed to perform on the other two projects.

The Supreme Court held that the contractor repudiated the agreement by informing the subcontractor that "it would not perform on the promissory note when its performance became due." The Court stated: "We have long recognized the rule of anticipatory breach: the repudiation of a contract before the time of performance has arrived amounts to a tender of breach of the entire contract and allows the injured party to immediately pursue an action for damages." *Id.* at 344.

Similarly, in *Mar-Len of Louisiana, Inc. v. Gorman-Rupp Co.*, 795 S.W.2d 880 (Tex. App.– Beaumont 1990, writ denied), a contractor agreed to build a facility for a third party. The plans required the contractor to install certain equipment in the facility. The contractor ordered the equipment from a supplier, who agreed to manufacture the required equipment. Thereafter, a dispute arose, and the supplier contended the contractor repudiated their contract. The Court first noted the governing principles regarding repudiation:

> When one party repudiates the agreement and refuses to be bound by material obligations, the other party may accept such repudiation as final and is not required to further regard the obligations imposed on him. Anticipatory repudiation of a contract may consist of either words or actions that indicate that a party is not going to perform the contract according to its terms in the future. Repudiation of a contract is a breach of contract.

*Id.* at 887.

41

At trial, the jury found the contractor breached the contract with the supplier. The Court of Appeals held that the evidence was sufficient to support the finding of repudiation. The contractor repudiated when it told the supplier that the contractor had stopped work on the project because of its dispute with the project owner, and that it expected the supplier to stop making the equipment it had ordered. When the supplier heard that the contractor was about to resolve its dispute with the owner, the supplier asked the contractor to confirm that it should continue making the equipment for the project, but the contractor never provided confirmation. In addition, the supplier sent a letter to the contractor stating that it considered the contractor to have repudiated the contract. *Id.* at 887-888. The Court held this was "certainly sufficient evidence upon which the jury could find that [the contractor] breached its contract with [the supplier] by repudiating it." *Id.* at 888.

In short, the legal standard for proving repudiation is not as high as imagined by Tubb and Superior: it simply requires evidence of "words or actions that indicate that a party is not going to perform the contract according to its terms in the future." *Mar-Len of Louisiana, Inc. v. Gorman-Rupp Co.*, 795 S.W.2d at 887.

42

B.    The evidence supports the trial court's finding of repudiation.

1.    The trial court made a broad finding of repudiation.

In finding #11, the Court stated: "There was a considerable amount of evidence that [Aspect] substantially performed its obligations under the Agreement and would have fully performed but for the breach and repudiation of the Agreement of Superior ..." (4 CR 455). In finding #30, the Court found: "Beginning shortly prior to the trip to Tyler and continuing thereafter, a series of actions and events occurred, when considered together, constitute a breach and repudiation of the agreement by Superior" (4 CR 458). As explained below, the Court made specific findings regarding those events, and the evidence supports the court's findings.

2.    Tubb's destructive conduct in November 2012 evidenced Superior's repudiation of the Agreement.

The trial court found –

•    Just before the Tyler visit, Tubb complained about the amount of money he had spent on the equipment for the business.

•    During the visit, Tubb said his son should run the manufacturing operation instead of Sterling, which "was contrary to a material term of the Agreement."

•    During the visit, Tubb said the equipment needed to be moved to Canadian, "a position in conflict with the parties' Agreement ... as it would remove [Aspect] as manufacturer."

43

- During the visit, Sue Tubb and Marilyn Ault questioned Sterling's integrity and the material terms of the Agreement, and Tubb communicated that information to Sterling.

(Findings #31-#34; 4 CR 458-459). The evidence supports these findings (see pages 16-21 above, which are incorporated herein by reference). Rue Marshall testified that when he left Aspect's facility in late October 2012, the equipment was "absolutely production ready" (4 RR 117, 162-163; 8 RR 99). Tubb's conduct two weeks later – when the business was ready to start producing ammunition – was a clear indication of his intent to repudiate the Agreement.

3. <u>Superior's refusal to supply the materials necessary to produce ammunition evidenced its repudiation of the Agreement.</u>

The trial court also found that –

- Tubb and Superior refused to obtain and provide the materials necessary for Aspect to produce ammunition.

- Tubb claimed he could not get additional bullet feeders for the operation, but they were readily available from the supplier.

- Tubb told Sterling he would ask a supplier at the next trade show for additional materials, but then told the supplier that no materials were needed.

- Superior and Tubb "would not provide the bullets needed to bring the final product to market."

- Superior removed 18,000 bullets at Aspect's facility and moved them to Superior's facility in Canadian. Tubb's other company, DTAC, later sold those bullets.

(Findings #35-#36; 4 CR 459). The evidence also supports these findings (see pages 32-33 above, which are incorporated herein by reference). Despite the fact that the equipment was ready to produce ammunition in late October 2012, Superior refused to deliver the materials required to produce ammunition until more than three months later, after the lawsuit was filed (7 RR 34, 55-58). Superior's refusal to supply the materials to produce ammunition for more than three months – and its removal of materials from Aspect so Tubb's other company could use the materials to produce and sell ammunition without Aspect – was a clear repudiation of the Agreement.

4.    Superior's refusal to enter into a written contract was a repudiation of the Agreement.

The trial court found that "Tubb's resistance to memorialize the Agreement in writing" constituted "a breach and confirmed Superior's repudiation of the parties' Agreement" (Finding #35, 4 CR 459). The evidence supports this finding (see pages 10-11 and 21-32 above, which are incorporated herein by reference). During their telephone conversation on January 8, 2013, James Sterling said they should have had a written contract "from the beginning." David Tubb agreed: "Yeah, we really should have" (PX-55; 01/08/13 at pgs. 8-9). Sterling repeatedly urged Tubb to sign a written contract, from before July 2012 through January 2013. On July 13 – eight months after Sterling entered into and began performing under the oral Agreement – Tubb

45

sent Sterling the email from Tubb's lawyer, which proposed scrapping the Agreement and replacing it with one in which Superior leased the equipment and sold supplies to Aspect, and Aspect loaded the ammunition and re-sold it to Superior (PX-82; 4 RR 57). Proposing a new contract with different terms to replace the original contract is a repudiation of the original contract. *Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 813-14 (Tex. App. – Tyler 1999, no writ). In their telephone call on December 31, 2012, David Tubb himself said: "we need to get an agreement if we're going to move forward on this ..." (PX-55; 12/31/12 at pg. 10). The undisputed fact that Tubb then refused to enter into a contract establishes Superior's repudiation of the Agreement.

5.      Sterling acknowledged Tubb's repudiation of the Agreement.

Tubb and Superior argue in their brief that even if they repudiated the Agreement, they are not liable for damages because Sterling and Aspect never "accepted" their repudiation (Appellants' Brief at pgs. 20-22). As shown above, on December 31, 2012, David Tubb himself said "we need to get an agreement if we're going to move forward on this" (PX-55; 12/31/12 at pg. 10). A week later, on January 7, Sterling sent an email to Tubb stating: "Without a contract, I will not spend any further time on this matter .... The only way forward at this point is to formalize our agreement in a signed contract" (PX-106, 4 RR 57).

Three weeks later – after Tubb refused to enter into a written contract – on January 29, Sterling sent an email to Superior's new consultant, with a copy to Tubb, confirming that Tubb had terminated Sterling's involvement in "all existing projects" (PX-102; 4 RR 57). A week later, on February 5, the attorney for Sterling and Aspect sent a letter to Tubb and Superior stating that their actions "amount to a *repudiation* of the venture and make it clear that you have no intention of abiding by the original agreement...," and demanding damages as a result of such repudiation (DX-24; 4 RR 57). Superior's argument that Aspect never "accepted" Superior's repudiation is without merit.

6. The Court should disregard the trial court's mistaken finding that Aspect did not have a license to manufacture ammunition.

The trial court made a finding of fact that Sterling and Aspect "lacked the necessary federal firearms license to manufacture ammunition" (Finding #56(e); 4 RR 465). The finding is not material in light of the court's other findings regarding the existence of the Agreement and its repudiation. Nonetheless, Sterling and Aspect challenge this finding on the ground that the record proves conclusively that Aspect was licensed to manufacture and sell ammunition (4 RR 66-67, 92; 6 RR 187). There is no evidence to the contrary.

47

III.   Legally sufficient evidence supports the trial court's award of restitution to Aspect.

   A.   Well-settled legal principles support the trial court's award of restitution to Aspect.

Damages for contractual injuries are designed to protect three interests: an expectation interest, a reliance interest, and a restitution interest. *Abraxas Pet. Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App. - El Paso 2000, no pet.). Restitution is available as a remedy for the breach of an express contract when the plaintiff has partially performed the contract but the defendant prevented the plaintiff's remaining performance. *Coon v. Schoeneman*, 476 S.W.2d 439, 442 (Tex. App. – Dallas 1972, writ ref'd n.r.e). In finding #37, the trial court found that Aspect fully or substantially performed the Agreement, and to the extent Aspect was unable to produce and sell ammunition, such inability was caused by Tubb and Superior (4 CR 460). This binding, unchallenged finding establishes the basis for restitution.

   B.   The evidence supports the trial court's award of restitution.

      1.   The evidence supports restitution based upon the value of the services provided to Superior.

Restitution is measured by the reasonable value of the services rendered. *Coon*, 476 S.W.2d at 442. To prove restitution damages, the plaintiff can offer his own testimony about the reasonable value of the services rendered. *Id.* The trial court

found that Aspect "sustained restitution damages in the amount of $175,000.00" based upon the reasonable value of the services that James Sterling provided through Aspect (Finding #40; 4 CR 460-461). The evidence supports this award for four reasons.

First, during their telephone conversations, David Tubb agreed that Sterling had contributed a tremendous amount of time to the project; that Sterling's time had value; and that Sterling should be paid if Tubb ended their business:

Tubb:      ... I thought we ought to visit ... *you've invested a lot of time in this* ...

Sterling:    I sure have (PX-55; 01/07/13 at pg. 2).

Tubb:      ... So what is your time at this point? *What's the value of your time at this point in time?*

Sterling:    ... I would have to total all of the time that I've invested in this, this year, but it's a high number.

Tubb:      What's your hourly – what's your hourly rate, James?

Sterling:    It's $140 an hour ... (PX-55; 01/07/3 at pg. 5).

           ... [M]y time has been applied to this joint venture as equity. You agreed to that. If we're going to have a falling out, then it's going to get addressed because I work for a living. *And I can't just set up an entire operation for you and then say ... you don't owe me anything....*

Tubb:      I understand that. *I agree, James.*

Sterling: *... [T]he only way we can move forward and you not pay me for my time this year is with a signed contract....* If that doesn't happen, then we're going to have a parting of the ways... (PX-55; 01/08/13 at pg. 7).

Tubb: ***... [Y]ou're worth 140 bucks an hour, 120 bucks an hour working on these QuickBooks and working on San Diego Media and all that stuff ....***

Sterling: *... Obviously my time is worth something.* All right?

Tubb: ***I agree. There's no doubt about that, James, I agree*** (PX-55; 01/08/13 at pg. 11).

Sterling: ... I'm not going to put myself in a position to where you hold all the assets and then I end up being some kind of employee even though I'm not. ... Because ... *my time ... does have value.*

Tubb: ***It does*** (PX-55; 01/08/13 at pg. 12).

Second, there was substantial testimony and numerous exhibits regarding Sterling's work from November 2011 through September 2012 with FillPro to design, assemble, and manufacture the equipment to produce ammunition; his work preparing the facility in Tyler for Aspect to manufacture ammunition; and his work designing the packaging to market the ammunition (see pages 8-16 above, which are incorporated herein by reference). Tubb and Superior have not specifically challenged the court's multiple findings regarding the services performed (Findings #19-#25, 4 CR 456-457).

Third, the testimony of other witnesses proved his substantial efforts for the business. Rue Marshall testified that the equipment in question was typically

50

purchased by a large company, which would have an entire committee of engineers, technicians, and production employees perform the work that James Sterling performed alone on this project (4 RR 150). Marshall testified that Sterling's investment of time and effort in the project was substantial (4 RR 152-153). Elizabeth Sterling testified that "James worked constantly;" "from the time he got up until the time he went to bed;" sometimes "he'd get up in the middle of the night" and work on the project; and he worked more than 40 hours a week on the business (8 RR 52-55).

Fourth, as a summary of his work, James Sterling prepared invoices for his services from October 1, 2011, through January 19, 2013 (PX-57; 4 RR 57; 6 RR 40). Tubb and Superior objected to the invoices on the grounds of lack of authentication, hearsay, and relevancy, which the court overruled (2 CR 218, 270). The invoices were summaries of Sterling's business records, including his calendar, notes, emails, and telephone records (6 RR 41). In fact, 58 pages of telephone bills reflecting calls between Sterling and Tubb during the time period were also admitted into evidence (PX-53; 4 RR 57). The paper copies of the emails generated for the project were 2 ½ to 3 feet high (4 RR 110-111). Thus, the invoices were admissible as summaries of voluminous business records under TEX. R. EVID. 803(6) and 1006.

Any alleged error in admitting the invoices was harmless anyway because the invoices were merely cumulative of the testimony admitted into evidence. *Mancorp,*

51

*Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex. 1990). James Sterling testified, without objection, that he worked at least 40 hours per week and the reasonable rate for his services was $140 per hour, which totals $22,400 per month, or $326,974.20 for the period in question. Superior had previously paid him $120 per hour on an earlier project, and he knew of a comparable service provider who charged $140 per hour. He testified that this rate was reasonable in the industry (4 RR 237-238). The transcript of a telephone conversations shown above proved the same facts (PX-55; 01/07/3 at pgs. 2-5, 01/08/3 at pgs 7-12). Also, as to restitution, Sterling testified as a service provider about the value of his own services, not as an expert witness about lost profits. Thus, Tubb and Superior's *Daubert* arguments on appeal about Sterling testifying as an expert on lost profits are irrelevant because the trial court did not award any lost profits (Appellants' Brief at pgs. 40-42).

> 2. <u>The evidence also supports restitution based upon the value of the benefits conferred on Superior.</u>

Restitution damages are also awarded to require the breaching defendant to give up the benefits it would be unjust for the defendant to keep. *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App. – Austin 1992, no writ). The evidence also supports the award of restitution on this basis for three reasons.

52

First, the trial court found that "the equipment had greater value when it was relinquished to [Tubb and Superior] than the sum total of the parts purchased as [Sterling and Aspect] had the equipment 'production ready' waiting on the component ammunition parts" (Finding #62; 4 CR 467). This finding is unchallenged, binding, and supported by the evidence (4 RR 117, 157-160, 163-164; see pages 8-9 and 12-16 above, which are incorporated herein by reference).

Second, James Sterling testified that his invoices totaling $326,974.20 were "actually pretty low, considering that Mr. Tubb has a piece of equipment and packaging and a year's worth of my time, which he can go and load ammunition now and make a lot more money than what I've asked him for in these invoices" (4 RR 239).

Third, the testimony of James Davis, the expert witness for Tubb and Superior, proved that the services of Sterling and Aspect conferred a benefit on Superior. During trial, Superior pursued a counterclaim against Aspect on a theory of conversion because Aspect did not immediately release the equipment to Superior after the lawsuit was filed. The trial court rejected Superior's counterclaim for conversion and Superior has not appealed that ruling (Finding #60, 4 CR 467). During the trial, however, Superior itself offered evidence of the value of the equipment to Superior. James Davis, Superior's own expert, testified that Tubb told

him the equipment had "a utilitarian business purpose;" that Tubb could put it to use in his ammunition manufacturing business; and that Tubb felt like he lost the use of the equipment (8 RR 166-167). During closing argument, Tubb's own attorney argued that benefits "could come from the use of that equipment in his business ..." (8 RR 209).

> 3.   Tubb and Superior did not prove and obtain findings on their defense of failure to mitigate damages.

Tubb and Superior also assert in their brief that "Aspect produced no evidence of any attempt to mitigate its damages by actually ordering the bullets" (Appellants' Brief at pg. 42). It is true that a plaintiff must exercise reasonable care to minimize damages if the damages can be avoided with only slight expense and reasonable effort. *Great Am. Ins. v. North Austin MUD*, 908 S.W.2d 415, 426 (Tex.1995). However, failure to mitigate damages is an affirmative defense. Tubb and Superior had the burden of introducing evidence and obtaining findings of fact on this affirmative defense. *Alamo Cmty. Coll. Dist. v. Miller*, 274 S.W.3d 779, 788 (Tex. App. – San Antonio 2008, no pet.). As to mitigation, the trial court found that when Aspect obtained bullets on its own to make cartridges, the "18,000 bullets that were at [Aspect's] facility were removed by Superior personnel, transported to Canadian and never returned," and that Tubb's other company, DTAC, sold the bullets (Finding

54

#36, 4 CR 459). This finding is unchallenged, binding, and shows that any effort by Aspect to obtain the materials that Superior agreed to supply would have been futile. In short, Tubb and Superior failed to prove and obtain findings on their affirmative defense of failure to mitigate damages.

4.    Superior's request for a remittitur is likewise without merit.

For the reasons explained above, the evidence is legally and factually sufficient to support the trial court's award of restitution. Thus, a remittitur is not proper. 6 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE §33:16 (2d ed. 2015). Furthermore, Tubb and Superior's assertion that "the maximum sustainable recovery" would not exceed "$70/hour for twelve 40-hour work weeks," has no basis in the record. They acknowledge as much by not citing the record for this ridiculous assertion (Appellants' Brief at pg. 46).

5.    The Court should affirm the award of restitution.

"A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938). There is no question that Superior's repudiation of the Agreement caused damages to Aspect. The evidence actually supports an award of $326,974.20 (4 RR 237-238). The trial court's award is very conservative: in awarding $175,000, the court awarded only 54% of what the

evidence would support. Consequently, the Court should affirm the trial court's award of restitution.

IV.     <u>Superior cannot prove it had a partnership with Aspect as a matter of law.</u>

Desperate to avoid its responsibility for destroying the business, Superior contends it proved the existence of a partnership "as a matter of law" and therefore can use the rule that a "partner is not entitled to receive compensation for services performed for a partnership..." to escape liability for the trial court's restitution award to Aspect (Appellants' Brief at pg. 37). *See* TEX. BUS. ORG. CODE § 152.203(c). The limited evidence regarding the existence of a partnership was at best conflicting; thus, Superior cannot establish the existence of a partnership as a matter of law.

One factor indicating that persons have created a partnership is the "expression of an intent to be partners in the business." *Id.* § 152.052. "Evidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Ingram v. Deere*, 288 S.W.3d 886, 900 (Tex. 2009). There is no evidence of this factor. Sterling testified he did not intend to create a partnership and never called their business a "partnership" (5 RR 7-8). As shown above, Sterling always wanted to carry out the terms of their Agreement in a corporation or limited liability company; that is what his draft contract indicated (PX-

56

1 at pg. 1; 4 RR 57, 120-121). Likewise, Tubb's own draft of a contract was for a limited liability company, not for a partnership (PX-100; 4 RR 57).

Another factor indicating that persons have created a partnership is the "participation or right to participate in control of the business." *Id.* § 152.052. "The right to control a business is the right to make executive decisions." *Ingram v. Deere*, 288 S.W.3d at 901. Sterling testified he did not have equal control of the business with Tubb because "he controlled the resources. He controlled the equipment. He controlled the money. And he set up the specifications and everything else, and I didn't have any control over that" (4 RR 256).

A third factor is whether Superior and Aspect contributed property to a "partnership." TEX. BUS. ORG. ACT § 152.052. Superior did not prove the existence of any partnership property. Under the entity theory of partnership in Texas, "[p]artnership property is not property of the partners." *Id.* § 152.101. In other words, for there to be a partnership, the partnership itself must own the property involved in the enterprise. It is undisputed that James Sterling owned the production facility used by Aspect (Finding #26, 4 CR 457; 4 RR 101-103). David Tubb repeatedly testified that Superior owned the equipment and would always own the equipment (6 RR 174-175, 177-178, 183). The court found that Superior used its own funds to pay for the equipment and did not take title in the name of any partnership or in the name of

57

Superior as a partner of any partnership (Finding #26, 4 CR 457; 7 RR 21). In this situation, the law presumes the property was *not* partnership property. TEX. BUS. ORG. ACT § 152.102(c).

For these reasons, the trial court properly found that the Agreement between Aspect and Superior was not a partnership for several reasons (Findings #12-#18; #26; #41-46; 4 CR 455, 457, 461). Superior cannot prove the existence of a partnership as a matter of law based upon the record in this case.

V.  Superior cannot prove it is entitled to attorney's fees as a matter of law.

    A.  The trial court found and concluded that Aspect did not breach the contract and that Superior is not entitled to attorney's fees.

    The trial court found that –

    • Aspect "substantially performed its obligations under the Agreement and would have fully performed but for the breach and repudiation of the Agreement of Superior ...."

    • "On or about January 7, 2013, Sterling made demand upon Superior for payment of the $35,019.00 in account receivables he had contributed to the venture and [Tubb and Superior] paid same."

(Findings #11 and #48, 4 CR 452, 462).

    The court concluded that –

    • Tubb and Superior "take nothing" on their claim for "breach of contract."

- "Superior is entitled to offset on [Aspect's] damages in the amount of $35,019.00" for its payment of the prior invoice in question.

- Tubb and Superior "are not entitled to attorney's fees."

(Conclusions #6-#8, 4 CR 467-468).

These rulings reflect the principles applied in *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195 (Tex. 2004). A contractor entered into a contract to build a pipeline for the owner of the pipeline. The jury found that both parties breached the contract and awarded damages to both parties. The Supreme Court held that "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Id.* at 196. A party's material breach releases the other party "from further obligation under the contract." *Id.* at 198. Materiality is a question of fact. *Id.* As a result of the contractor's material first breach of the contract, the trial court was required to disregard the jury's finding that the owner breached the contract and the jury's award of damages to the contractor. *Id.* at 200.

Applying these principles to this case, the trial court impliedly found that Superior's first material breach of the Agreement released Aspect from its obligation under the Agreement to forego payment of the prior invoice in the amount of $35,019.00. The trial court correctly held that because of Superior's first material

59

breach, the fact that thereafter "Sterling made demand upon Superior for payment of the $35,019.00 in account receivables he had contributed to the venture and [Tubb and Superior] paid same" (Finding #48, 4 CR 462), did not constitute a breach of contract (Conclusion #6, 4 CR 467). The remedy of restitution has its roots in equity. *City of Harker Heights*, 830 S.W.2d at 317. In giving Superior a credit for its payment of $35,019.00 against the damages awarded to Aspect (Conclusion #7, 4 CR 468), the trial court was simply fashioning its equitable remedy of restitution and was not awarding damages to Superior for breach of contract.

B.    <u>Superior has not challenged the findings that Aspect did not breach the Agreement.</u>

In its brief, Superior claims the trial court's award of the $35,019.00 credit "establishes Aspect's contract breach and Superior's right to an attorney's fee award as a matter of law" (Appellants' Brief at pg. 47). To the contrary, as explained above, the trial court impliedly found that because of Superior's first material breach, Aspect did not breach the Agreement. Superior has not challenged that implied finding or any other findings on this issue by specific legal or factual insufficiency complaints. Those findings are therefore now binding. 6 ROY W. MCDONALD AND ELAINE A. GRAFTON CARLSON, TEXAS APPELLATE PRACTICE § 18:12 (2d ed. 2015). Without a finding that Aspect breached the Agreement and an award of damages based upon a

60

breach of contract, Superior cannot recover any attorney's fees. *Mustang Pipeline Co.*, 134 S.W.3d at 201.

C.  <u>Superior has not challenged the implied findings that its attorney's fees were neither reasonable nor necessary.</u>

Even if Superior could prove as a matter of law that Aspect breached the Agreement and that it recovered damages based upon such breach, to recover attorney's fees under TEX. CIV. PRAC. & REM. CODE §38.001, Superior was also required to obtain findings of fact that its fees were both reasonable and necessary. *Crounse v. State Farm Mut. Auto. Ins. Co.*, 336 S.W.3d 717, 720 (Tex. App. – Dallas 2010, pet. denied).

The parties stipulated that if the court "determines after the bench trial on the merits that a party is entitled to attorney's fees, said fees will be submitted on motion papers and affidavits" (2 CR 244). Pursuant to the stipulation, after the trial, Aspect filed a motion for attorney's fees with a supporting affidavit and billing records (4 CR 502). By contrast, the record does not contain any motion for attorney's fees or proof submitted by Superior. In concluding that Tubb and Superior "are not entitled to attorney's fees" (Conclusion #8, 4 CR 468), the trial court impliedly found there was no evidence that Superior's attorney's fees were reasonable and necessary. Having failed to submit any evidence to the court below of the reasonableness and

61

necessity of its attorney's fees, Superior cannot establish now as a matter of law that it is entitled to recover attorney's fees from Aspect.

## **PRAYER**

For these reasons, Sterling and Aspect request the Court to affirm the judgment of the trial court and to tax all costs against Tubb and Superior. They also request the general and special relief at law and in equity they are entitled to receive.

Respectfully submitted,

M. KEITH DOLLAHITE, P.C.
5457 Donnybrook Avenue
Tyler, Texas 75703
(903) 581-2110
(903) 581-2113 (Facsimile)
keith@mkdlaw.us

/s/ Keith Dollahite
By:_____
M. Keith Dollahite
State Bar No. 05958550

TREY YARBROUGH
State Bar No. 22133500
YARBROUGH WILCOX, PLLC
100 E. Ferguson, Suite 1015
Tyler, Texas 75702
903-595-3111 office
903-595-0191 fax
Trey@yw-lawfirm.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4(i)(3), I certify that this document contains 14,728 words based on the word count of the computer program used to prepare the document, excluding the sections not counted under Tex. R. App. P. 9.4(i)(1), which is below the maximum of 15,000 words in Tex. R. App. P. 9.4(i)(2).

/s/ Keith Dollahite

_____

## CERTIFICATE OF SERVICE

A copy of this document was filed and served electronically on Gregory D. Smith, Ramey & Flock, P.C., 100 East Ferguson, Suite 500, Tyler, Texas 75702, gsmith@rameyflock.com and Wesley Hill, P.O. Box 1231, Longview, Texas 75606, wh@swfirm.com on October 8, 2015.

/s/ Keith Dollahite

_____

© M. Keith Dollahite, P.C. 2015